**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

_____

**No: 22-2827**

_____

Heidi Nelson, formerly known
as Heidi Martin,

Appellant,

vs.

Lake Elmo Bank; and Olivia Alvarado,
individually and as an employee,

Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

_____

**APPELLANT'S BRIEF AND ADDENDUM**
_____

Stephen C. Fiebiger (#0149664)
Stephen C. Fiebiger Law Office, Chtd.
3000 West County Road 42, Suite 310
Burnsville, MN 55337
(952) 746-5171
Stephenfieblaw@gmail.com

**ATTORNEY FOR APPELLANT**

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

Heidi Nelson was fired as Assistant Vice President for Teller Services by Lake Elmo Bank after Olivia Alvarado, a teller, accused her of grabbing her breasts, saying she wanted to take her into the bathroom and fuck her, licking her face, and trying to French kiss her and her boyfriend at a bar in front of witnesses. Alvarado reported Nelson to the Bank but gave differing accounts. She first said Nelson grabbed her boyfriend, then said she grabbed her. She described events at the bar along with an unflattering rumor about Nelson. Alvarado was removed from Nelson's supervision before Nelson's interview. Nelson adamantly denied the accusations and provided eye witnesses the Bank never contacted. The Bank had Alvarado review her investigation report, but not Nelson. The Human Resources Manager shredded the interview notes contrary to the Bank's policy and Nelson was fired. Two months earlier Alvarado wrote a scathing peer review urging the Bank take action against Nelson. By contrast, males at the Bank who harassed women and violated policies were not investigated or disciplined.

Nelson sued Alvarado and the Bank for defamation and the Bank for sex discrimination in violation of the Minnesota Human Rights Act (MHRA), Minn. Stat. Sec. 363.01. *et seq*. The district court, the Honorable John R. Tunheim, granted summary judgment. Nelson requests fifteen minutes of oral argument to address these important issues.

Appellate Case: 22-2827     Page: 2     Date Filed: 10/21/2022 Entry ID: 5210155

# TABLE OF CONTENTS

Page

Summary and Request for Oral Argument………………………………………………i

Table of Authorities…………………………………………………………….…iv

Jurisdictional Statement…………………………………………….……...…….... 1

Statement of Issues…………………………………………...………….……..1

Statement of the Case…………………………………………..…………..2

   I.  Background…………………...…..………………………………3

   1.  The Bank's Policies ……………………………….………………..…………4
   2.  Steve Madsen………………………………………………………..........5
   3.  Barney Patterson………………………………………………7
   4.  Ana Martin …..………………………..……………………………8
   5.  Olivia Alvarado …….…………..………………………..…………8
   6.  Peer Review ………………………….……..…………….…………9

  II. Events at the Bar on September 21, 2018……..…………….……………11
  1. Alvarado's Report to Plante ………..…………………………11
  2. Roettger's Interview of Alvarado……………………….........................11
  3. Alvarado's Initial Deposition Version..…………….…………………......13
  4. Alvarado's Omitted Parts of Her Story……..……………………........14
  5. Nelson's Version..…………….…..……….……………………...............15
  6. The Investigation……………………….……………………….............17
     a. Alvarado's Interview ……………………………………....17
     b. The Bank's Interview with Nelson …………………………………...20
     c. Shredded Interview Notes …………………………………22
  7. Communication of Defamatory Statements…..…………….……………23
  8. Discharge Decision..……………………………………….…25
  9. The Bank's Argument on Performance and Inappropriate Conduct ..……27

Summary of the Argument……………………………..…………………...27

Standard of Review ...............................................................................28

Appellate Case: 22-2827     Page: 3     Date Filed: 10/21/2022 Entry ID: 5210155

Argument……………………………………………….…………28

I. Genuine Issues of Material Fact Exist on Nelson's Sex Discrimination
   Claim Against Lake Elmo Bank for Sex Discrimination Under the
   Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01, et seq,
   and Summary Judgment was Improper …………………………………28

   1. Sham Investigation ………………………………………………29
   2. Inconsistencies Cast Doubt on Believability ………………………..32
   3. Policy Violations …………………………………………………34
   4. Similarly Situated Males Treated More Favorably …………………36
   5. Failure to Investigate Policy Violations ………………………………40
   6. Shifting Reasons ………………………………………………………41

II.   The District Court Erred Granting Summary Judgment on Nelson's
      Defamation Claims against Lake Elmo Bank and Olivia
      Alvarado…………………………………………………………..42

   1. Defamation ………………………………………………………..42
   2. Qualified Privilege ………………………………………………43
   3. Actual Malice for Statements Made in the Course of Investigation …...44
      a. Alvarado's Complaint ……………………………………...44
      b. The Bank's Internal Discussions …………………………..49
   4. Statements Outside the Bank …………………………………………50
      a. No Qualified Privilege …………………………………………50
      b. Malice for Statements to Family and Friends ………………...57

Conclusion …………………………………………………………..59

Certificate of Compliance…………………………………………………60

iii

Appellate Case: 22-2827     Page: 4     Date Filed: 10/21/2022 Entry ID: 5210155

# TABLE OF AUTHORITIES

**Page**

*Anderson v. Kammeier*, 262 N.W.2d 366 (Minn. 1977)…...…………………… 43

*Bahr v. Boise Cascade Corp.*,
766 N.W. 2d 910 (Minn. 2009) ……………………………..……44, 45, 47, 48, 49

*Bone v G4s Youth Servis., LLC*, 686 F.3d 948 (8th Cir. 2012) ……..………….37

*Friedell v. Blakely Printing Co.*, 203 N.W. 974 (Minn. 1925) …………….............44

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007) ..…………..........30

*In Re United Health Group Inc. Shareholder Derivative Litigation*,
754 N.W.2d 544 (Minn. 2008) ……………………………….……………….52

*Jadwin v. Minneapolis Star & Tribune*, 367 N.W.2d 476 (Minn. 1985) ………...42

*Johnson v. AT&T Corp.*, 422 F.3d 756 (8th Cir. 2005) …………………..29, 30, 31

*Lake v. Yellow Transportation, Inc.*,
596 F.3d 871 (8th Cir. 2010) ……………….………………………...28, 34, 36, 41

*Lewis v. Equitable Life Assur. Soc. of the U.S.*,
389 N.W.2d 876 (Minn. 1986)………………..43, 44, 45, 46, 49, 50, 51, 55, 57, 58

*Loyd v. Saint Joseph Mercy Oakland*,766 F.3d 580 (6th Cir. 2014) ……………..30

*Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868 (Minn. 2019) …...………….43

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) …...…………………40

*Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 323 (Minn. 2000) …...…52

*Mudrich v. Wal-Mart Stores, Inc.*, 955 F.Supp.2d 1001 (D. Minn. 2013) ……..…40

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) …………..33, 34

*Rideout v. JBS USA, LLC*, 716 F.3d 1079 (8th Cir. 2013) ……………......36, 37, 40

Appellate Case: 22-2827    Page: 5    Date Filed: 10/21/2022 Entry ID: 5210155

*Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011 (8th Cir. 2005) ………....32, 42

*Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252 (Minn. 1980)…………..45, 46

*Tisdale v. Federal Express Corp.*, 415 F.3d 516 (6th Cir. 2005) ……………….30

*Tolan v. Cotton*, 572 U.S. 650 (2014) ……………………………….28, 34, 48, 59

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) …………………32

*Trulillo v. PacifiCorp.*, 524 F.3d 1149 (10th Cir. 2008) ……..……………….....30

*Wallace v. DTG Operations, Inc.*, 442 F.3d 1112 (8th Cir. 2006) ………...…32, 33

*Weinberger v. Maplewood Review*, 668 N.W.2d 667 (Minn. 2003) …………......42

*White v. Honeywell, Inc.*,141 F.3d 1270 (8th Cir. 1998) …………………….37, 39

## **Statutes**

28 U.S.C. §1291………………………………………………...……….1

28 U.S.C. §1332(a)(1) ………………………………………………..1

Minn. Stat. § 363A.01, et seq …………………………………………..i, 2, 28

Minn. Stat. § 480.065, subd. 3..………………………………………...53

## **Rules**

Federal Rules of Appellate Procedure 4(a)(1)(B)………………………………..1

Federal Rules of Civil Procedure 8(c) …………………………………...51

Federal Rules of Evidence 801(d)(2)(D) …………………………….....37

## **Other Authorities**

Restatement (Second) of Torts § 597 (1977) …………………………….55, 56, 57

v

## JURISDICTIONAL STATEMENT

Nelson appeals from summary judgment granted by the U.S. District Court, District of Minnesota, pursuant to an Order dated July 29, 2022. The slip opinion is at 2022 WL 3721870. The district court had diversity jurisdiction under 28 U.S.C. §1332(a)(1). This appeal was filed on August 25, 2022, pursuant to 28 U.S.C. §1291 and FRAP 4(a)(1)(B), as a matter of right from the final judgment of August 1, 2022.

## STATEMENT OF ISSUES

I.    **Whether the District Court Erred Granting Summary Judgment on Nelson's Sex Discrimination Claims Against the Lake Elmo Bank Under the Minnesota Human Rights Act, Minn. Stat. § 363A.01, et seq?**

Apposite Cases:

1.  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871 (8th Cir. 2010)
2.  *Wallace v. DTG Operations, Inc..* 442 F.3d 1112 (8th Cir. 2006)
3.  *Rideout v. JBS USA, LLC*, 716 F.3d 1079 (8th Cir. 2013)

II.   **Whether the District Court Erred Granting Summary Judgment on Nelson's Defamation Claim Against Lake Elmo Bank and Olivia Alvarado ?**

Apposite Cases:

1.  *Stuempges v. Parke, Davis & Co..*, 297 N.W.2d 252 (Minn. 1980)
2.  *Lewis v. Equitable Life Assurance Soc. of the U.S.*, 389 N.W.2d 876 (Minn. 1986)
3.  *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009)

Appellate Case: 22-2827    Page: 7    Date Filed: 10/21/2022 Entry ID: 5210155

## STATEMENT OF THE CASE

Heidi Nelson was fired by Lake Elmo Bank after co-worker Olivia Alvarado complained that Nelson sexually assaulted her at a bar by grabbing her breasts and stating she wanted to "take her into the bathroom and fuck her," tried to French kiss her and her boyfriend, and other offensive conduct in front of witnesses, including her boyfriend, Nelson's fiancé, and others. The accusations were false. The Bank interviewed Alvarado and Nelson, then shredded the interview notes contrary to policy. Alvarado's report contained humiliating rumors about Nelson and lies about seeing a psychologist. The Bank declined to interview eye witnesses provided by Nelson. Exonerating evidence from Nelson and inconsistencies and lies by Alvarado were overlooked. The Bank had Alvarado review her report, but not Nelson. Nelson was fired. Nelson sued the Bank and Alvarado for defamation and the Bank for sex discrimination in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01, et seq. The district court granted summary judgment on Nelson's claims.[1] Nelson appeals.

### I. Background.

Nelson was a 33-year employee and Assistant Vice President of Teller Services at the Lake Elmo office. APP142,143,R.Doc. 44, at 118-19,125. She supervised the tellers at three branch locations and handled compliance,

---

[1] Nelson's former surname was Martin.

2

certifications, and policies and procedures for all three branches. APP142,143,R. Doc.44, at 53, 88, 125. Her job took her to other parts of the office. APP134,R.Doc. 44, at 88. She often worked Monday through Saturday APP143,R.Doc. 44, at 125.

Nelson was under Anne Plante, Vice President of Retail Banking and Daniel Raleigh, President and CEO. APP325,R.Doc. 43,62, at 31. Rebecca Billingsley was Vice President and Director of Human Resources. APP267,R. Doc. 43,40, at 6. Billingsley reported to Raleigh and supervised Human Resources manager Julie Roettger. APP267,R.Doc. 43,40. at 7. Roettger started in 2017. APP233,R.Doc. 43,30, at 15.

Nelson performed well at the Bank. Her last performance review was conducted by Plante in August, 2018. APP310,R.Doc.43,60, at 76; R.Doc.43,6. Plante wrote "When Heidi works as a teller it serves to improve morale and comradery as that underscores her commitment and support of the teller department and staff." APP312,R.Doc. 43,60, at 81. She described Nelson as "flexible," and someone who "will sometimes open and close the bank, teller when necessary and assist with the receptionist desk, tellering on a routine basis, both in lobby and drive up, aids in increasing morale within the department." APP312,R.Doc. 43,60, at 84.

Appellate Case: 22-2827    Page: 9    Date Filed: 10/21/2022 Entry ID: 5210155

### 1. The Bank's Policies.

The Bank's policies on sexual harassment were contained in the Employee Handbook, but were outdated and incomplete. APP139, R.Doc. 40, at 139. Employees could report suspected sexual harassment to a supervisor or one of the following:

1. Rebecca R. Billingsley – Director of Human Resources
2. Patricia A. Wright – Human Resources Manager
3. Daniel D. Raleigh – President/CEO

APP101,R.Doc.43,2, at 12. Wright retired in 2017 and the policy was never updated. APP147,R.Doc. 44, at 140.

The Handbook lacked provisions insuring that reports of sexual harassment or discrimination would be investigated and responded to once reported, or manner of resolution. APP101-02,R.Doc.43,2, at 16-17. The policy contained no prohibition against interviewing non-bank employees in an investigation. APP085-111,R.Doc. 43,2. Roettger was unaware of a standard protocol for investigating complaints of sexual harassment. APP232,R.Doc. 43,30, at 11. She did not know of any steps for investigating complaints. APP233,R.Doc. 43,30, at 15. Roettger had no training at the Bank for conducting sexual harassment investigations. *Id*.

### 2. Steve Madsen.

Steve Madsen was vice-president in charge of investments and

reported to President Raleigh.  R.Doc. 43,1, at 7-8.

In 2015 – 2016, Madsen began an inappropriate relationship with Molly O'Malley, a teller and customer service rep supervised by Nelson.  APP161,R.Doc. 44, at 195-96; R.Doc. 43,1. at 21, 22.  It was a secret and intimate relationship. R.Doc. 43,1,  at 22, 23, 26.  Madsen was married.  APP161,R.Doc. 44, at 196. The relationship was terminated by O'Malley, while Madsen did not want it to end. R.Doc#43,#1, at 23, 24.  O'Malley was pregnant (by her husband) and wanted the relationship to end.  R.Doc.43,1, at 24.

O'Malley told Nelson she went to human resources to make a complaint [about Madsen] after she was pregnant and her relationship with Madsen ended. APP161,R.Doc. 44, at 197.  She told Nelson that Madsen was "bothering" her.  *Id.* Madsen was directly across the lobby from her and human resources had told him he could not go over to the coffee area.  *Id.*  Madsen told Nelson that O'Malley was trying to do a harassment complaint.  APP162,R.Doc. 44, at 198.

Madsen shared information with Nelson about the relationship. APP162,R.Doc. 44, at 198; R.Doc.43,1, at 12.  Madsen was never contacted by human resources about his relationship with O'Malley.  R.Doc. 43,1, at 26. O'Malley took maternity leave in March, 2016.  R.Doc, 43,1 . at 24.

Human resources told Nelson to move O'Malley to the Stillwater branch from Lake Elmo.  APP161,R.Doc. 44, at 197.  O'Malley was told the move was so

5

that when she returned from maternity leave she would have more opportunity to get hours and work on Saturdays. *Id.* Nelson moved O'Malley to Stillwater about a month before her due date. APP162,R.Doc. 44, at 198-99.

Madsen told Nelson that when a [baby] shower for O'Malley was scheduled, he was told he could not attend because O'Malley was pursuing a harassment complaint. APP162,R.Doc. 44, at 198. His attendance would not be good for O'Malley and she would have to leave because he (Madsen) was not going anywhere. *Id.* When O'Malley was ready to return from her maternity leave, however, human resources determined that the Bank no longer had a position available for her. APP162,R.Doc. 44, at 201.

President Raleigh said he was aware of "something" with O'Malley and Madsen, but did not know specifics. APP323,R.Doc. 43,62, at 23. He understood that the relationship ended and when it ended O'Malley and Madsen spoke with the Bank's human resources person and that was the end of it. *Id.* He was unaware of any internal investigation or complaints against Madsen. *Id.* Madsen received no discipline in connection with O'Malley. R.Doc.43,1, at 37. Neither Roettger, Billingsley, or Raleigh discussed the Bank's sexual harassment policies with Madsen. R.Doc. 43,1, at 11.

Billingsley was unaware of the romantic relationship between Madsen and O'Malley. APP271,R.Doc.43,40, at 22. She knew of no complaints of sexual

6

harassment against male employees at the bank in over twenty years. R.Doc. 43,40, at 23. Nelson said the Bank handled male issues differently than it handled female issues with her. APP163,R.Doc. 44, at 202.

### 3. Barney Patterson.

Nelson and female tellers were subjected to sexually offensive comments by the manager of IT, Barney Patterson. APP164-165,APP184,R.Doc. 44, at 206-210, 286-87. Patterson would say "sexual things" to Nelson and her employees. APP164,R.Doc. 44, at 206. He frequently came to work intoxicated which Nelson and her subordinates reported to human resources. APP164,R.Doc. 44, at 206, 208. Billingsley was aware of employee reports of his intoxication. APP270,R.Doc. 43,40, at 17. So was President Raleigh's wife. APP164,R.Doc. 44, at 208.

Patterson would bring the Bank's computer system online and make sexual comments to Nelson and her subordinates. APP164,R.Doc. 44, at 206. When women asked Patterson for help getting the computer activated, he would smirk and laugh and say to Nelson about her then husband that it "sounds like John has an issue, not the computer." APP164,R.Doc. 44, at 206-07. Patterson made similar sexual comments to others in the department. Nelson told them to go to the HR manager. APP164,R.Doc. 44, at 207. Patterson continued making offensive comments the whole time Nelson worked at the Bank into 2018. *Id*. She told him

7

he shouldn't be saying those things – but he continued making offensive remarks until she was fired.  APP164,R.Doc. 44, at 207, 208.

### 4.  Ana Martin.

Ana Martin was a teller who experienced a number of incidents with Patterson.  APP164,R.Doc. 44, at 209.   Nelson observed Patterson next to Martin on the teller line talking to Martin.  *Id.*  Martin told Nelson that Patterson was making inappropriate comments.  *Id.*  Martin talked about Patterson's unprovoked comments and Nelson told her she should go to human resources about the harassment.  APP164-65,R.Doc. 44, at 209-210.

Nelson sought to depose Martin about Patterson's harassment and report to management, but the Bank opposed.  Nelson's motion to compel Martin's deposition was denied.  APP029,R.Doc. 31

### 5.  Olivia Alvarado.

Alvarado worked as a teller since high school and was supervised by Nelson. She applied for a promotion to operations assistant in September, 2017, but did not receive the position.  APP200,R.Doc. 43,15, at 23-25.  Alvarado wanted to move into the customer service department and emailed Anne Plante in February, 2018 after meeting with her about opportunities.  APP201,R.Doc. 43,15, at 25-26. Alvarado by-passed Nelson and went directly to Plante.  APP201,R.Doc. 43,15, at 27-28.

## 6.  Peer Review.

Alvarado completed a peer review for Nelson on July 9, 2018 she sent to Roettger and Plante that the district court found "scathing."  APP202,R.Doc. 43,15, at 32;  APP240-41,R.Doc. 43,30. at 44, 47;  APP307,R.Doc. 43,60, at 64; APP067,R.Doc. 43,18;  Order at 18,ADD018.  In the review, Alvarado repeatedly criticized Nelson's behavior inside and outside of the Bank.  She wrote "she stands around in the lobby talking to co-workers and even customers about whatever predicament she seems to find herself stumbling in to at local bars." APP203,R.Doc. 43,15, at 34; APP067,R.Doc. 43,18, at 1.  Alvarado offered "I can't say either that she contributes to a positive and productive work environment."  APP203,R.Doc. 43,15, at 36; APP067,R.Doc. 43,18, at 1.  She wrote that Nelson took two and two and a half hour lunches and left work [early] at 3:30.  APP203, 206,R.Doc. 43,15. at 36, 45; APP067,068,R.Doc. 43,18.  Alvarado admitted Nelson did not take two hour lunches or leave every day at 3:30. APP204,R.Doc. 43,15, at 37.  She described Nelson as talking "degradingly or condescendingly" to co-workers, but could cite no examples.  APP204, 205,R.Doc. 43,15, at 39, 41-42;  APP067,R.Doc. 43,18.

Alvarado denigrated Nelson as "absent minded" several times in the review. She described Nelson as "absent-minded" for scheduling tellers.  APP206,R.Doc. 43,15, at 47;  APP069,R.Doc. 43,18, at 3.  She wrote "Other than generally

monitoring overall teller operations (as in bank totals), making schedules (usually correctly/helpfully) and occasional training, **I'm not really sure what she does here because she's always either absent or absent-minded**." APP207,R.Doc. 43,15, at 50; APP069,R.Doc. 43,18, at 3 (emphasis added). Alvarado emphasized for Roettger that Nelson was absent-minded. APP207,R.Doc. 43,15, at 51. She continued **"In conclusion, I (obviously) strongly believe that action needs to be taken against Heidi."** "**It's clear that Heidi's personal life is becoming a factor against the Bank's overall image. She's letting her own issues and bar room flaunts affect her work life."** APP207-08,R.Doc. 43,15, at 52, 53; APP070,R.Doc.43,18, at 4. Alvarado closed with **"She has become lazy with scheduling, absent-minded in general, and it has been difficult to say that she's been the strongest asset to the Bank's team. Heidi's position not only here at the Bank, but also her position in the community require her to hold demeanor to a higher standard than what she recently has been putting forward."** APP208,R.Doc. 43,15, at 54; APP070,R.Doc. 43,18, at 4. Alvarado received no response to the review. APP208,R.Doc. 43,15, at 56. She never raised these criticisms with Nelson. *Id*.

Roettger had Alvarado send her the review on September 25, 2018 as part of the investigation of Nelson. APP258,R.Doc. 43,30, at 114. The review also went

to Billingsley. Roettger said it was considered in Nelson's termination.

APP258,R.Doc. 43,30, at 116.

## II. Events at the Bar of September 21, 2018.

### 1. Alvarado's Report to Plante.

Alvarado first went to Plante's office on September 25, 2018.

APP295,R.Doc. 43,60, at 16. She was upset over an exchange with Nelson at a bar over the weekend. *Id.* Plante said Alvarado reported that Nelson said that she wanted to fuck her all over the floor of the bathroom. *Id.* Alvarado told Plante her boyfriend came to her side to leave the building with her and that Nelson grabbed **him** inappropriately in a sexual manner. *Id.* Alvarado said she was not comfortable with Nelson. *Id.* Plante told Alvarado she would get her with HR immediately and accompanied her to Roettger's office. APP295-96,R.Doc. 43,60, at 16-17. Plante left and was not part of their meeting. *Id*.

### 2. Roettger's Interview of Alvarado.

Alvarado was interviewed by Roettger on September 25, 2018.

APP221,R.Doc. 43,15. at 105; APP061,R.Doc. 43,24. Roettger asked questions, took notes, and wrote a report about the interview and other information.

APP221,R.Doc. 43,15 at 106.

Roettger's reported Alvarado's version of events at the bar, including "Heidi then came over to Olivia and asked if she deserved having to deal with Heidi's

11

boyfriend's ex-girlfriend." APP221, R.Doc. 43,15 at 107; APP061,R.Doc. 43,24, at 1. It continued, **"Heidi then thanked Olivia and grabbed Olivia's breasts and said I'd like to [take] you in the bathroom and fuck you."** APP221,R.Doc. 43,15, at 108; APP061,R.Doc. 43,24, at 1. Alvarado confirmed this is what she told Roettger. APP221,R.Doc. 43,15, at 108. Roettger wrote that "Heidi was laughing when this was said to Olivia, and Olivia believes she was joking, but Olivia was still disturbed by it. It was also obvious to Olivia that Heidi was intoxicated." APP221,R.Doc. 43,15, at 108; APP061-62,R.Doc. 43,24, at 1-2.

Roettger wrote "Olivia told her boyfriend about what happened then he asked if they should leave but Olivia and him decided to stay but to avoid Heidi." APP221,R.Doc. 43,15, at 108; APP061-62,R.Doc. 43,24, at 2. Roettger reported **"After some time had passed Heidi went to the area of the bar that Olivia and Olivia's boyfriend and asked them to come over to the area of Heidi and Heidi's boyfriend. Heidi then asked Olivia if her and her boyfriend would like to go to the strip club with them. Olivia declined and said, no, that's really not my thing. Heidi was also trying to put her tongue in Olivia's mouth (trying to French kiss her) but Olivia kept turning her face away, so Heidi actually ended up licking Olivia's face. Olivia mentioned that Heidi attempted to do the same thing to her boyfriend."** (emphasis added). APP221,R.Doc. 43,15. at 109; APP062,R.Doc. 43,24, at 2. Alvarado said this is

12

what she told Roettger.  APP222,R.Doc. 43,15, at 109.  "Heidi and her boyfriend left shortly after this exchange."  APP221,R.Doc. 43,15, at 109;  APP062,R.Doc. 43,24, at 2.  Alvarado said the events at the bar occurred within 45 minutes. APP222,R.Doc. 43,15. at 109.

Alvarado reported rumors about Nelson that Roettger included in the report. Roettger wrote "**after a bank Christmas Party at the Twin Point bar she would put shots in between her breasts and ask fellow male co-workers to come and get them.  Olivia was not involved and was not there, but heard rumors.**" APP063,R.Doc. 43,24, at 3.

Alvarado and Roettger reviewed the report a couple days after "[j]ust to review that everything was correct …"  APP221,R.Doc. 43,15, at 105.

### 3. Alvarado's Initial Deposition Version.

Alvarado testified that she and her boyfriend, Brylen Mulvahill, had been out for dinner and began drinking.  APP211,R.Doc. 43,15, at 67.  She had wine while he had a mixed drank.  APP211,R.Doc. 43,15, at 67, 68.  From dinner they went to the Harbor Bar around 10 pm.  APP211-12,R.Doc. 43,15, at 66, 67, 69. They ordered more mixed drinks at the bar. APP212,R.Doc. 43,15, at 70.

Alvarado saw Nelson arrive with her fiancé,  Todd Nelson.  APP212,R.Doc. 43,15, at 71.  She and Nelson made eye contact and they said hello and made small talk.  APP212,R.Doc. 43,15, at 72.  She did not see Nelson drink alcohol.  *Id*.

13

Todd Nelson's ex-girlfriend, Kirsten Green, was there with one of Alvarado's friends. APP213,R.Doc. 43,15, at 73. Alvarado said Green was talking with someone at their table. APP213,R.Doc. 43,15, at 73, 74. Alvarado said that Nelson started thanking her for being on her side and called Todd over. *Id.* Alvarado said Nelson **"then started trying to kiss me, grabbed my chest and said she wanted to fuck me on the bathroom floor."** *Id.* Mr. Nelson was right there. APP213,R.Doc. 43,15, at 73. Alvarado said Nelson grabbed her breasts two-handed. APP213,R.Doc. 43,15, at 75. No one said anything. *Id.* Alvarado went back to the table to get her boyfriend and they stepped outside and she told him what happened. APP213,R.Doc. 43,15, at 75-76. She said they went back inside "and kind of kept our distance." APP213,R.Doc. 43,15, at 76. Despite sitting with friends, she did not tell anyone what happened. APP214,R.Doc. 43,15, at 77. She had no further contact with Nelson other than to wave good bye when she left. *Id.* Alvarado and her boyfriend had more drinks before leaving. APP214,R.Doc. 43,15, at 79.

### 4. Alvarado Omitted Parts of Her Story.

In her deposition, Alvarado omitted events she reported to Roettger. She omitted the part about "after some time passed Heidi went to the area of the bar that Alvarado and her boyfriend, or Nelson trying to put her tongue in Alvarado's mouth, trying to French kiss her, but she kept turning her face away so she actually

14

ended up licking Alvarado's face, and that Nelson attempted to do the same thing to Alvarado's boyfriend. APP222, R.Doc. 43,15, at 109-110. When asked why she did not mention these events, Alvarado explained that she "completely forgot about that part." APP222,R.Doc. 43,15, at 110. Alvarado continued to describe the evening's events:

> "There was -- yeah, a strip club right across the river in to whatever town that is, like north Hudson over the St. Croix, and they said, you know, we're getting ready to leave, do you want to come to the strip club with us and I said no. Never been to one and don't think I want my first time being with my boyfriend and my boss, and she was trying to persuade me to come on, let's go, it will be fun and then like French kiss me or lick my face or whatever."

APP222,R.Doc. 43,15, at 110-111.

Alvarado said Nelson was standing about six inches away. APP222,R.Doc. 43,15, at 111. She said she did not avoid Nelson because she was just trying to keep things "normal." *Id.* She admitted it was an important part of the evening's events, but she forgot. APP222,R.Doc. 43,15, at 111-112.

## 5. Nelson's Version.

Nelson was bowling with her employee league the evening of September 18, 2018. APP177,R.Doc. 44, at 260, 261. Afterwards, she and her current husband, Todd Nelson, arrived at the bar around 10:15 – 10:30 p.m. APP177,R.Doc. 44, at 241. Nelson had maybe two drinks before arriving. APP173,R.Doc. 44. at 245. She was not intoxicated. APP177,R.Doc. 44, at 260;

15

APP081,R.Doc. 42, at 1.  They walked in with a friend, Neal Riley, and his

acquaintance and sat down at the bar.  APP173,R.Doc. 44, at 242.  They engaged

with the bartender.  APP173,R.Doc. 44, at 243.  They ordered a beer and noticed

Mr. Nelson's ex-girlfriend, Kirsten Green, approaching.  The bartender asked

Green to get away from them so she did not talk to Mr. Nelson.  *Id*.  Green had

been harassing Mr. Nelson.  APP174,R.Doc. 44, at 248.

Alvarado approached Nelson's group.  APP173,R.Doc. 44, at 244, 245.  She

talked about who had been with whom sexually among those at the bar.

APP175,R.Doc. 44, at 250.  She appeared to be trying to evoke a reaction from

Nelson.  APP081-82,R.Doc. 42, at 1.  Alvarado was intoxicated.  APP177,R.Doc.

44, at 261; APP081,R.Doc. 42, at 1.  Alvarado pointed to a table and said "those

are some of the friend's, Todd, that Kirsten's been with." *Id*.  Looking at Nelson,

Alvarado said, "And Chris' ex-wife Roni was with that one."  *Id*.  Mr. Riley

interjected "You're going to be in the same position as Kirsten if you don't go back

over there because I'll have Sam kick you out."  APP173-74,R.Doc. 44, at 245-46.

Nelson said "hi" and that they had been bowling with bank co-workers because

Alvarado worked at the bank.  APP174,R.Doc. 44. at 246.  Alvarado returned to

her group.  *Id*.

Alvarado returned to Nelson's group and Riley admonished her to stop

drinking.  APP174,R.Doc. 44, at 246.  Nelson and her fiancé decided to leave

because Alvarado was making them uncomfortable talking about Mr. Nelson's ex-wife having sex, and Green having sex with these young men. APP174,R.Doc.44, at 248-49. It was inappropriate. APP174,R.Doc. 44, at 249. Nelson and her fiancé left after about 30 to 45 minutes. *Id.*

Nelson denied the offensive conduct alleged to have occurred at the bar that night by Alvarado. She did not grab Alvarado's breasts, tell her she wanted to take her into the bathroom and fuck her, or try to French kiss her and her boyfriend. APP168,178,R.Doc. 44, at 224-225, 262.

Todd Nelson was an eye witness. He said that Nelson did not grab Alvarado's breasts, try to French kiss her and her boyfriend, or say she wanted to take her into the bathroom and fuck her, as Alvarado alleged. APP082,R.Doc. 42, at 2. He was present with Nelson the entire time at the bar. *Id.* They did not invite Alvarado and her boyfriend to a strip club. *Id.* The accusations by Alvarado did not happen and are false. *Id.* Nelson reported Alvarado's and the Bank's false accusations to Mr. Nelson and was distraught. *Id.* The bar had a security camera. APP082,R.Doc. 42, at 3.

### 6. The Investigation.

#### a. Alvarado's Interview.

Alvarado met with Roettger the morning of September 25, 2018 for under an hour. APP243,R.Doc. 43,30, at 56. Roettger took handwritten notes that were

17

typed up into her report.  APP243,R.Doc. 43,30, at 53-54.  She later shredded the notes.  APP243,R.Doc. 43,30, at 54.  She could not remember whether she wrote every word from her handwritten notes into the typewritten document. APP243,R.Doc. 43,30, at 54-55.

Roettger said the Bank had to believe Alvarado was being honest because they had "nothing else to go on."  APP246,R.Doc, 43,30, at 66.  Nelson reported there were other witnesses, but the Bank made the decision based on what was reported by Alvarado not to go out and interview individuals who were not with the bank.  APP246,R.Doc. 43,30, at 66-67.

Roettger did not attempt to contact Alvarado's boyfriend, Brylen Mulvahill, about the events at the bar.  APP248,R.Doc. 43,30, at 76-77.  She said "we're not the police, we're not going to start doing investigation with individuals outside the bank."  APP249,R.Doc. 43,30, at 77.  She did not contact Alvarado's step-father, Mike Mazzara, a Bank employee who was identified in her report. APP249,R.Doc. 43,30, at 78.

Roettger's report included a rumor by Alvarado about Nelson at a bank Christmas party.  APP249,R.Doc. 43,30, at 79-80;  APP063,R.Doc. 43,24, at 3.  Alvarado told Roettger she heard that Nelson "would put shots between her breasts and ask fellow male co-workers to come and get them."  APP249,R.Doc. 43,30, at 80; APP063,R.Doc. 43,24, at 3.  Alvarado did not know whether this was true or

18

not.  APP223,R.Doc. 43,15, at 114.  Nelson was not asked about these accusations.

APP072-74,R,Doc, 43, 12, at 1-3.

Roettger's report included Alvarado's text to Nelson on September 23, 2018, stating:

**'Hi Heidi, I just want to let you know in advance I won't be in tomorrow.  My anxiety has been really bad this weekend and I really need to kind of recollect myself.  It's honestly just been intolerable.  I might see if I can get in to see my psychologist, but if I feel better I'll try to come in for the last half of the day.  I'll keep in touch tough okay?? Thank you.'**  Heart emoji.

APP250,R.Doc. 43,30, at 81; APP063,R.Doc. 43,24, at 3; and

APP065,R.Doc. 43,11.

Alvarado testified she did not have a psychologist, and that her psychologist was her mom.  APP216,R.Doc. 43,15, at 86.  Her mother was not a licensed psychologist.  APP217,R.Doc. 43,15. at 89.  Alvarado was not treating with a psychologist when she texted Nelson.  APP216,R.Doc. 43,30, at 87, 88.  Her statement about getting in to see her psychologist was a lie.  APP217,R.Doc. 43,15, at 89.

Roettger discussed Alvarado's text to Nelson about the psychologist in Alvarado's interview.  APP250,R.Doc. 43,30, at 82.  Roettger separately asked Plante if she was aware of anything with respect to a condition that would necessitate seeing a psychologist, but Plante was unaware.  APP250,R.Doc. 43,30, at 82-83.  She included Plante's response.  APP251,R.Doc. 43,30, at 88-89;

APP063,R.Doc. 43,24.  It was important that Alvarado provide truthful information during the interview and she could face discipline for not doing so. APP250-51,R.Doc. 43,30, at 84, 85.

Alvarado was moved to customer service the day she met with APP224,R.Doc. 43,15, at 118; APP074,R.Doc. 43,12, at 3.  Plante became her supervisor.  APP224,R.Doc. 43,15, at 119-20.

Billingsley did not participate in Alvarado's interview and Roettger does not know the reason.  APP243,R.Doc. 43,30, at 55.  Roettger's report would have been viewed by Billingsley and Raleigh.  APP248,R.Doc. 43,30, at 75.

### b.  The Bank's Interview with Nelson.

Roettger and Billingsley interviewed Nelson the day after Alvarado.  Nelson emphatically denied that the incidents alleged by Alvarado took place. APP178,193,R.Doc. 44, at 262, 322-23.  She did not physically grab or touch Alvarado at the bar or whisper in her ear.  APP193,R.Doc. 44, at 322.  Roettger acknowledged that Nelson did not admit the allegations.  APP254,R.Doc. 43,30, at 97; APP072,R.Doc. 43,12, at 1.

Roettger wrote a report about Nelson and shredded the notes from the interview.  APP243,R.Doc. 43,30, at 54.  The report was just over two pages. APP072-73,R.Doc. 43,12, at 1-3.

Appellate Case: 22-2827    Page: 26    Date Filed: 10/21/2022 Entry ID: 5210155

Roettger characterized Nelson's responses as equivocal, stating "it seemed as if Heidi initially admitted the allegations were true."  APP072,R.Doc. 43,12, at 1.

Roettger wrote: "Heidi did not directly admit that the specific grabbing of breasts, comments about 'fucking in the bathroom,' and attempts to kiss occurred." APP072,R.Doc. 43,12, at 1.  Roettger asked Nelson to speculate why Alvarado might lie.  APP073,R.Doc. 43,12, at 2.  Her response stated in part, "Heidi alluded that her boyfriend Todd was standing right there during that conversation and so he would have known if there was anything happening between Heidi and Olivia that was out of the norm and/or where Heidi was mistreating Olivia."  *Id*.

Nelson provided Roettger and Billingsley with names of witnesses to contact, including Sam the bartender, co-employees she was bowling with, Todd Nelson, and Neal Riley.  APP177-78,R.Doc. 44, at 261-62 ;  APP073,R.Doc. 42,12, at 2.  She said her version could be easily verified and that she was not intoxicated.  APP178,R.Doc. 44, at 262.

Billingsley and Roettger told Nelson that Alvarado would be moved off the teller line to customer service and no longer under her supervision.  APP256-57, R.Doc. 43,30, at 109-10; APP074,R.Doc. 43,12, at 3.  They told Nelson that she would not be conducting Alvarado's performance review.  APP257,R.Doc. 43,12, at 108-09; APP074,R.Doc. 43,12, at 3.  This decision was made before Billingsley

21

and Roettger met with Nelson.  APP257,R.Doc. 43,30, at 109.  Instead, Plante conducted Alvarado's review.  APP257,R.Doc. 43,30, at 108-09.

### c.  Shredded Interview Notes.

Roettger shredded her notes from the interviews with Alvarado and Nelson. APP243,R.Doc. 43,30, at 53, 54.   Nobody instructed her to shred the notes nor had she been trained to shred notes from sexual harassment interviews.    APP243,R. Doc. 43,30, at 55.  President Raleigh said the Bank's policy was to keep notes from investigatory interviews and put those into the [employee's] file.  APP340,R.Doc. 43,62, at 89.  He expected that Roettger would retain her notes from investigating the allegations of sexual harassment against Nelson.  APP334,R.Doc. 43,62, at 68. He said shredding the notes would be inappropriate.  *Id*.  Billingsley agreed that keeping notes from an investigation would help ensure the accuracy of an investigation.  APP270,R.Doc. 43,40, at 19.  That's the HR Manager's responsibility.  APP270,R.Doc. 43,40, at 19-20.

Roettger was not instructed to shred interview notes or trained to do so. APP243,R.Doc. 43,30, at 55.  She did not tell Billingsley she had shredded the notes.  APP287,R.Doc. 43,40, at 86, 87.  Billingsley said that Roettger typically made sure the notes got in the file.  APP270,R.Doc. 43,40, at 19, 20.  Billingsley was unaware Roettger shredded the notes.  APP282,R.Doc. 43,40, at 67.  Roettger

Appellate Case: 22-2827    Page: 28    Date Filed: 10/21/2022 Entry ID: 5210155

did not remember including every word from the interview in the report. APP243,R.Doc. 43,30, at 54-5.

### 7. Communication of Defamatory Statements.

Before reporting the defamatory statements about Nelson to the Bank, Alvarado told others. She initially communicated the statements to Mulvahill at the bar. APP213,R.Doc. 43,15, at 76. She told him outside and they went back in with their friends. *Id.* She also discussed the statements with him the following day. APP215,R.Doc. 43,15, at 82.

Alvarado went to the home of her mother, Becky Mazzara, and step-father Mike Mazzara, on Monday, September 24, and told them everything. APP215,R.Doc. 43,15, at 83. Her mother taught at the high school. APP217,R.Doc. 43,15. at 89. Mike Mazzara worked at the Bank and was home for lunch. APP215,R.Doc. 43,15, at 84. Alvarado asked him what she should do. *Id.* Mazzara did not tell her who to talk to at the Bank. APP215,R.Doc. 43,15, at 84. He said it would be her word against Nelson's. *Id.*

She communicated the statements to her father, Armando Alvarado, who lived in Wisconsin. APP225,R.Doc. 43,15, at 124. She told him that Nelson grabbed her breasts and said she wanted to take her into the bathroom and fuck her at the bar. *Id.* She told him Nelson tried to French kiss her and licked her face –

23

and likely her boyfriend, Mulvahill, too. *Id.* She also communicated most of the statements to her step-mother, Veronica Alvarado. APP226,R.Doc. 43,15, at 128.

In her interview at the Bank, Alvarado told Roettger that she had described the events at the bar to Plante, Roettger and Mazzara. APP223,R.Doc. 43,15, at 113; APP062,R.Doc. 43,24. Mazzara discussed it with Nelson's father. APP193,R.Doc. 44, at 324, 325.

Roettger and Billingsley told Raleigh what Alvarado said happened. APP321,R.Doc. 43,62, at 13. Roettger and Billingsley discussed the statements with Nelson in her interview. APP284-5,R.Doc. 43,40, at 72-73.

The day Nelson was fired, October 2, 2018, Alvarado met with Billingsley who gave her a memo. APP288,R.Doc, 43,40, at 94 ; APP076,R.Doc. 43,26. They discussed her complaints with Nelson. Billingsley told Alvarado that Nelson was no longer at the Bank. APP288,R.Doc. 43,40, at 94. Billingsley said "clearly it was based on Olivia's allegations as a result of the investigation." *Id.* The Bank notified everyone that Nelson was no longer employed. APP315,R.Doc. 43,60, at 96; R.Doc. 43,39.

Alvarado texted with her father, Armando Alvarado, on October 2 to tell him about Nelson's firing. APP225,R.Doc. 43,15, at 124; APP079,R.Doc. 43,28. She texted " Yep sooo they let me leave early today to design my headstone." APP079,R.Doc. 43,28. He was amused, "Lmao," by her firing and indicated he

24

and Alvarado had talked about Nelson. *Id.* She texted "I'm sure it was just 35 years of stuff built up," but did not know if this was true. APP226,R.Doc. 43,15, at 125-26; APP079,R.Doc. 43,28. Alvarado was concerned she would be blamed for Nelson's firing. *Id*. She texted "Yeah. I just know everyone's going to put two and two together that it was me." *Id.* He responded, "I don't think so, everyone knows." *Id*.

Nelson told her father the allegations that Alvarado had made about her. APP192,R.Doc. 44, at 318. She told Steve Madsen why she was terminated. R.Doc. 43,1, at 16, 17. She told her therapist and Todd Nelson before and after her termination. APP192,R.Doc. 43,15, at 321; APP082-83,R.Doc. 42, at 2-3.

### 8. Discharge Decision.

Raleigh said Nelson was terminated by a "group decision" by him, Roettger, and Billingsley. APP321,R.Doc. 43,62, at 15. Billingsley said the decision to terminate Nelson was made by her and Raleigh. APP288,R.Doc. 43,40, at 90. Nelson was the only employee ever terminated in a group decision by these three Bank officials as discharge is usually handled by the supervisor and HR. APP321,R.Doc. 43,62, at 15. Raleigh had no discussions with Nelson about Alvarado's allegations. APP321,R.Doc. 43,62, at 15-16. He said they followed the advice of counsel, but that he had not personally spoken with counsel.

Appellate Case: 22-2827    Page: 31    Date Filed: 10/21/2022 Entry ID: 5210155

APP321,R.Doc. 43,62, at 14, 16.  His information came from Roettger and Billingsley.  APP321,R.Doc. 43,62, at 13.

Raleigh did not review Roettger's report of her interview with Alvarado. APP332,R.Doc. 43,62, at 58.  He also never reviewed the report on Nelson's interview.  APP334,R.Doc. 43,62, at 65.

Raleigh had no discussions with Roettger or Billingsley about interviewing non-bank employees.  APP322,R.Doc. 43,62, at 18.  Roettger and Billingsley told him what happened although he couldn't remember the details.  APP321,R.Doc. 43,62, at 13.  They told him Nelson didn't deny it.  *Id.*  Nelson, however, said that when she spoke to the Bank's human resources representatives about Alvarado's complaint that she specifically denied the allegations.  APP193,R.Doc. 44, at 322-23.

The Bank offered another version of the termination decision.  The Bank stated that "Members of LEB's management team, including Ms. Billingsley, Mr. Roettger (sic), Anne Plante, Vice President Retail Banking Manager, and Daniel Raleigh, President/CEO, reviewed and discussed the information collected during the investigation prior to making a determination.  Upon conclusion of the investigation, Defendant LEB concluded that Ms. Alvarado's allegations were credible and decided to terminate Plaintiff's employment."  R.Doc. 43,63, at 4.

26

Plante, however, was not involved in the investigation or discharge decision. APP296,315,R.Doc. 43,60, at 19, 20, 95. She never discussed what Alvarado reported to her with Raleigh or Billingsley. APP296,R.Doc. 43,60, at 18-19. Plante had nothing to do with investigations. APP298,R.Doc. 43,60, at 28. Typically, though, the employee's supervisor and HR person handle discharge according to Raleigh. APP321,R.Doc. 43,62, at 15.

**9. The Bank's Argument on Performance and Inappropriate Conduct.**

At the summary judgment hearing, the Bank argued for the first time that Nelson's "history of other performance issues and inappropriate conduct" weighed in on her discharge. T-4. Nelson had received a satisfactory review in her last performance review and was not warned of performance problems that could jeopardize her job. R.Doc. 43,6.

## SUMMARY OF THE ARGUMENT

Nelson was wrongfully accused of sexual harassment by Alvarado for events at a bar in front of witnesses that resulted in her discharge. The Bank intentionally ignored contradictory evidence and witnesses provided by Nelson and conducted a cursory investigation with a predetermined outcome that she be fired. The Bank did not similarly investigate or discipline males for policy violations. Alvarado published the defamatory statements to others. The district court erred granting summary judgment on Nelson's claim against the Bank for sex discrimination in

27

violation of the Minnesota Human Rights Act and defamation claim against the Bank and Alvarado. Genuine issues of material fact exist on Nelson's evidence of pretext for her MHRA claim. The district court erred weighing evidence of malice to defeat qualified privilege for the Bank on her defamation claim and by creating a qualified privilege not recognized by the Minnesota supreme court for her defamatory statements published to family and friends. The district court further erred by not addressing Nelson's evidence of malice to defeat qualified privilege for her family and friends.

## STANDARD OF REVIEW

The standard of review of the district court's granting of summary judgment is *de novo*. *Lake v. Yellow Transportation, Inc.*, 596 F.3d 871, 873 (8th Cir. 2010).

## ARGUMENT

**I. Genuine Issues of Material Fact Exist on Nelson's Sex Discrimination Claim Against Lake Elmo Bank Under the Minnesota Human Rights Act, Minn. Stat. § 363A.01, et seq, and Summary Judgment was Improper.**

The district court found that that Nelson had not presented evidence of pretext for discrimination sufficient to defeat summary judgment. Order at 10-15,ADD010-015. The district court examined three grounds that the Bank's proffered reason for discharging Nelson was pretext: (1) the Bank's investigation into Alvarado's sexual harassment claim was faulty, (2) the Bank violated its own

28

policies, and (3) the Bank treated similarly situated male employees more favorably than it treated Nelson. *Id.* The district court's analysis failed to follow the axiom at summary judgment that the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014)(citations omitted). The district court failed to view the evidence in a light most favorable to Nelson and address evidence of shifting reasons for her termination to show pretext. These issues will be discussed in turn.

### 1. Sham Investigation.

The district court erred concluding that a reasonable person would not find that the Bank's investigation to be abnormal or inadequate. Order at 11,ADD011. Alvarado was interviewed alone by Roettger for about an hour while two officials interviewed Nelson. From the interview, the Bank removed Nelson's supervisory duties over Alvarado before Nelson was interviewed. A reasonable jury could conclude that the Bank's actions in removing duties from Nelson before obtaining her version of events reflected a predetermined outcome that she would be disciplined, not that it believed Alvarado. The Bank deliberately avoided interviewing witnesses identified by Nelson and disregarded exonerating evidence.

A reasonable jury could find that Nelson presented evidence to show pretext that the Bank did not honestly believe the investigation results. *Johnson v. AT&T*

Appellate Case: 22-2827    Page: 35    Date Filed: 10/21/2022 Entry ID: 5210155

*Corp.*, 422 F.3d 756, 762 (8th Cir. 2005). The Bank had tunnel vision and failed to interview favorable witnesses. In her interview with Roettger and Billingsley, Nelson identified Todd Nelson, Neil Riley, and others at the bar. Alvarado said her boyfriend was there and initially told Plante that Nelson grabbed her boyfriend inappropriately. She did not tell Plante that she was grabbed inappropriately. The Bank made no attempt to obtain independent corroboration of Alvarado's accusations against Nelson.

In applying the honest belief rule, the key inquiry of an employer's investigation is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014). To rebut an employer's invocation of the rule, the plaintiff must offer some evidence of an error on the part of the employer that is too obvious to be unintentional. *Id*. The Bank did nothing to seek the truth after receiving Alvarado's complaint and intentionally ignored other witnesses and evidence. A reasonable jury could find the Bank's refusal to interview other witnesses, or attempt to contact them, raises an inference of discrimination and pretext. *See Trulillo v. PacifiCorp.*, 524 F.3d 1149, 1158 (10th Cir. 2008) (irregularities in investigation); *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 530 (6th Cir. 2005) (failure to interview outside witness); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) (only one interview). A jury

30

could find that by not interviewing witnesses besides Alvarado and Nelson the Bank did not want to discover the truth of what happened because it planned to fire Nelson.[2]

Alvarado told Roettger that Nelson grabbed her breasts and said nothing about grabbing her boyfriend. She lied to Roettger about seeing a psychologist but was asked no details. Roettger questioned this by asking Plante if she knew about the psychologist and included her query in the report. Roettger included Alvarado's text to Nelson with lies in the report despite no corroboration. Alvarado was permitted to review the report but made no changes.[3] The Bank's alleged honest belief in the investigation's results is dubious and indicates pretext. *Johnson*, 422 F.3d at 762.

The report by Roettger raises doubt about whether the Bank honestly believed Alvarado' allegation. She included Alvarado's outrageous rumor about Nelson's conduct at a company Christmas party but did not ask Nelson about the accusation. A reasonable jury could conclude the Bank failed to ask Nelson about accusations in Alvarado's report because they did not believe them.

---

[2] Nelson produced evidence the Bank predetermined the outcome of an investigation involving her complaint against a co-employee and Plante in 2017. APP273,R.Doc. 43,40, at 30-32; R.Doc. 43,49 (email of 1/26/2017 assuming conclusion of no harassment); R.Doc. 43,50 (Raleigh draft closure memo of 1/30/2017).

[3] Nelson was not afforded opportunity to review the report on her.

31

The Bank's policies contained no steps it was required to take for investigating sexual harassment. APP085-111,R.Doc. 43,2. Roettger was unable to articulate the steps for an investigation. The Bank should not receive the favorable inference afforded by the district court - that Nelson could not point to a policy violation - resulting from its inadequate policies for investigating and resolving complaints. Order at 11,ADD011. A reasonable jury could find that the Bank's sexual harassment policies were inadequate and the Bank's poor investigation was a product of its desire to avoid finding discrimination.

### 2. Inconsistencies Cast Doubt on Believability.

The district court's conclusion that Alvarado's statements to Plante and Roettger about Nelson were not contradictory conflicts with the evidence. Order at 11, ADD011. Alvarado told Plante that Nelson grabbed her boyfriend inappropriately. But she told Roettger that Nelson grabbed her breasts at the bar. She lied about information she provided in the investigation. Pretext can be shown with evidence that the Bank's explanation is unworthy of credence because it has no basis in fact or raises doubt as to the legitimacy of the defendant's motive. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120-21 (8th Cir. 2006), abrogated on other grounds, *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *see also Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005). A reasonable jury could find Alvarado's inconsistent statements bear

on the credibility of her story that lacks basis in fact.  *Wallace*, 442 F.3d at 1120-21.

The Bank's disregard for Alvarado's inconsistencies and lies in the investigation could be viewed by a jury as evidence of pretext because the evidence raises genuine issues about the believability of her accusations against Nelson.  *Wallace*, 442 F.3d at 1120-21.  Roettger asked Alvarado about Alvarado seeing a psychologist and text to Nelson in her interview.  APP063,R.Doc.43,24, at 3.  Alvarado affirmed this information to Roettger and again in reviewing the report, but it was a lie.  APP250,R.Doc. 43,40, at 82.  Roettger's asking Plante if she was aware of any condition of Alvarado suggests she questioned Alvarado's truthfulness.  *Id.*

Alvarado told Roettger rumors about Nelson putting shots in between her breasts and asking fellow male co-workers males to come and get them after a bank Christmas party.  APP063,R.Doc. 43,24, at 3.  A reasonable juror could find that the Bank did not ask Nelson about these accusations because they were not believable – like her original accusations.

Demonstrating that the employer's reasons are "unworthy of credence" supports finding sex discrimination because "a trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 147 (2000).  Because a jury could infer pretext from Alvarado's lies and statements unworthy of credence, the district court erred not viewing the evidence favorably to Nelson.  *Tolan*, 572 U.S. at 651.

### 3.    Policy Violations.

The district court erroneously discounted Nelson's evidence of the Bank violating and not following its own policies as pretext.  Order at 12,ADD012.    A plaintiff may show pretext by establishing that its employer failed to follow its own policies in taking action against them.  *Lake*, 596 F.3d at 874.

The Bank failed to follow its own policy of placing handwritten investigation notes into the employee's file by Roettger's shredding her hand written notes from Alvarado's and Nelson's interviews.  Order at 12.ADD012.  In a deposition, the Bank's president said that shredding the interview notes would be inappropriate.  Order at 12,ADD012;  APP334,R.Doc. 43,62, at 82.  The district court erroneously gave greater weight to testimony by the Bank president stating that shredding handwritten notes after they were transcribed was expected.  Order at 12,ADD012.  From this, the district court erroneously concluded that "[i]t thus appears from the record that it is against the Bank practice to destroy notes from an interview if there are no copies of those notes.  Here, Roettger maintained transcribed copies of her notes." *Id*.

Appellate Case: 22-2827    Page: 40    Date Filed: 10/21/2022 Entry ID: 5210155

The district court did not view the evidence about the shredded notes in a light most favorable to Nelson. Pretext can also be shown by evidence it was not the employer's policy or practice to respond in the way it responded in the plaintiff's case." *Rideout v. JBS USA, LLC*, 716 F.3d 1079, 1084 (8th Cir. 2013).

President Raleigh also said "Our policy is to keep notes on meetings and put them in to the file. Typically someone will hand write and type those in to the file. We accept it that way." APP340,R.Doc. 43,62, at 89. He did not know the practice for taking handwritten notes and transferring them to a word document. APP339,R.Doc. 43,62, at 86. Billingsley testified that Roettger typically did a good job of "making sure we get the notes in the file." APP270,R.Doc. 43,40, at 19-20. Placing the notes into Nelson's file would also avoid them being lost, thrown into the waste basket, or getting into the wrong hands.

Roettger did not maintain copies of her notes and they were not transcribed in the manner described by the district court. The district court's finding that it is "uncontradicted that Roettger transcribed the handwritten notes prior to destroying them and that the transcribed notes were maintained" is wrong. Order at 12,n,4,ADD012. Roettger could not recall transcribing everything in the handwritten notes. APP243,R.Doc. 43,30, at 54-55. Roettger's boss, Billingsley, did not know what happened to the notes and Roettger never told her they were shredded. APP282,R.Doc. 43,40, at 67. The Bank only produced Roettger's

35

reports on Alvarado and Nelson that were not transcriptions of the interviews, but summaries of the investigation that included information and observations beyond the interviews. The reports were not standard, different questions were asked, and different information collected. Alvarado's boyfriend's name was not mentioned despite being a witness. Alvarado's report mistakenly discussed a situation in the "lobby of the Bar" instead of the Bank. APP283,R.Doc. 43,40, at 69; APP061,R.Doc. 43,24, at 1. Alvarado was asked what action she wanted taken and was moved before Nelson's interview. There was no evidence that writing a summary complied with the Bank's policy to retain handwritten interview notes from investigations. The accuracy of the reports from the interviews is suspect and the district court erred by excluding the policy violation as evidence of pretext at summary judgment.[4] *Lake*, 596 F.3d at 874.

### 4. Similarly Situated Males Treated More Favorably.

The district court erred by concluding Nelson failed to present evidence of similarly situated males who were treated more favorably. Order at 13,ADD013. The district court determined that Nelson's comparators, Steve Madsen and Barney Patterson, were not similarly situated so as to show pretext by the Bank. *Id.* at 14-15,ADD014-15.

---

[4] The district court discounted Nelson's contention that the Bank spoliated evidence. Order at 12,n.4,ADD012. But Roettger hid the fact she shredded the

36

The "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Rideout*, 716 F.3d at 1085. At the pretext stage, comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. *Bone v G4s Youth Servis., LLC*, 686 F.3d 948, 956 (8th Cir. 2012). The district court erroneously found that Nelson and Madsen did not engage in the same conduct or have the same supervisor. Order at 13-15,ADD013-015.

A reasonable jury could find that the [alleged] sexual harassment by Nelson was the same or similar conduct as the sexual harassment perpetrated by Madsen towards Molly O'Malley. O'Malley told Nelson about a complaint against Madsen. Madsen admitted to Nelson that O'Malley was doing a complaint against him for conduct after their relationship ended. The statements by O'Malley were not hearsay and were admissible when made during her employment concerning a matter within the scope of the employment. *White v. Honeywell, Inc.*, 141 F.3d 1270,1276 (8th Cir. 1998); Fed.R.Evid. 801 (d)(2)(D). Raleigh said there was something that was addressed by human resources. O'Malley was transferred to a different location and when she was ready to return from maternity leave told that there were no more hours for her. The absence of a formal complaint could be

---

notes from Billingsley and Raleigh. A reasonable jury could find she intended the

37

construed as the Bank exhibiting a policy and practice not to engage such complaints for males. For purposes of Madsen as a comparator to Nelson, a reasonable jury could find that the Bank acted quickly to fire Nelson for Alvarado's complaint but did not investigate Madsen's sexual harassment of O'Malley, much less impose discipline.

The district court erroneously concluded that Madsen and Nelson did not report to the same supervisor, President Daniel Raleigh. Order at 14,ADD014. The court found that Nelson's supervisor was Anne Plante. *Id*. Madsen reported to President Raleigh. Raleigh acknowledge he supervised Nelson at times and the supervisory role transitioned to Plante, but he could not state the time frame. APP330,R.Doc. 43,62, at 50. The record shows that Raleigh acted as Nelson's supervisor for all dispositive purposes. He was the ultimate authority for investigating and disciplining Nelson dating back to 2017 up through her termination in 2018. R.Doc. 43, 49,50, 51, 52, 61. Plante was not involved in any of the Bank's investigations concerning Nelson and had no input into her discharge on October 2, 2018. Raleigh, however, participated in her investigation and discharge decision. Plante did not even know the reason for Nelson's termination. APP296,R.Doc. 43,60, at 20. The fact that Plante held some supervisory responsibilities goes to the weight of the evidence for determining who was

consequence of her actions to destroy evidence favorable to Nelson.

38

Nelson's supervisor that should be resolved by a jury. A reasonable juror could conclude that Nelson and Madsen had the same supervisor at the Bank for the most important duty of discipline and discharge: Raleigh.

Barney Patterson sexually harassed Nelson, Ana Martin, and other females at the Bank and frequently came to work intoxicated. Yet he faced no investigation or discipline for violating the Bank's policies. The district court erred by discounting Patterson as a comparator for showing pretext by the Bank. Order at 14,ADD014.

The Bank took no steps to investigate Patterson's sexual harassment or to discipline him. Nelson told Patterson to stop the harassment but he continued until Nelson was fired. Patterson harassed Ana Martin with inappropriate comments and Nelson told her to go to human resources, but Patterson faced no discipline. Martin's statements are admissible. *White*, 141 F.3d at 1276. The Magistrate Judge denied Nelson's motion to compel Martin's deposition, but she could be subpoenaed for trial. The Bank's failure to investigate Patterson for harassment could be viewed as pretext and these facts should be viewed most favorably to Nelson.

The Bank further took no action against Patterson for violating policy by reporting to work intoxicated. Nelson and others complained. A jury could find the level of seriousness of frequent intoxication at work is equally as serious as

Appellate Case: 22-2827   Page: 45   Date Filed: 10/21/2022 Entry ID: 5210155

Alvarado's sexual harassment allegations against Nelson. *See Rideout*, 716 F.3d at 108 (wearing a mock Ku Klux Klan outfit was equally as serious as raising voice).

Because a reasonable jury could conclude that management level males were treated differently with respect to the Bank's application of its sexual harassment and code of conduct policies, the district court erred finding they were not proper comparators. Order at 15,ADD015.

### 5. Failure to Investigate Policy Violations.

Genuine issues of material fact exist regarding the Bank's practice of not investigating reports of discrimination or violation of policies involving males as evidence of pretext. A reasonable juror could conclude that the reason for the dearth of complaints of sexual harassment and policy violations is because the Bank did not investigate or act on them. Madsen and Patterson are examples. The Bank's policies give no guidance for investigating complaints. APP100-101, R.Doc#43,#2, at 16-17. There will be no records of complaints not taken, investigated, or acted upon. If sex discrimination was, indeed, present in the workplace, preventing investigations from occurring, then different disciplinary histories would be expected. *Mudrich v. Wal-Mart Stores, Inc.*, 955 F.Supp.2d 1001, 1010 (D. Minn. 2013). Nelson must be afforded a fair opportunity to show that the Bank's reason for the differential treatment was in fact pretext. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

### 6. Shifting Reasons.

The district court erred by failing to address the Bank's shifting reasons for Nelson's termination which showed pretext. An employer's shifting reasons for an employee's discharge evidences pretext. *Lake*, 596 F.3d at 874.

Billingsley testified Nelson was terminated for sexual misconduct. APP287,R.Doc. 43,40, at 87. But the Bank has since indicated that it considered other factors. Roettger testified that Alvarado's peer review was considered in Nelson's discharge. APP258,R.Doc. 43,30, at 116. At the summary judgment hearing, the Bank raised "a history of performance issues and inappropriate conduct" of Nelson. T-4. Nelson did not have a history of performance issues and inappropriate conduct and the Bank did not point to such evidence. Nelson's most recent performance review of August 2018 was satisfactory. R.Doc. 43,6. A reasonable jury could find the Bank's changing explanations for her discharge demonstrated pretext by the Bank. *Lake*, 596 F.3d at 874. The district court did not address this argument and should be reversed.

Additionally, Alvarado's July peer review of Nelson did not deal with events at the bar in September. Considering the review in Nelson's discharge is evidence of shifting reasons behind her discharge and pretext. *Lake*, 596 F.3d at 874. Nelson was not asked about the review. A reasonable juror could find the

Bank's inclusion of the review as a reason considered for her discharge lacked

credibility and believability. *Strate*, 398 F.3d at 1021.

## II. The District Court Erred Granting Summary Judgment on Nelson's Defamation Claims Against Lake Elmo Bank and Alvarado.

Throughout history, personal reputation has been cherished as important and

highly worthy of protection. *Jadwin v. Minneapolis Star & Tribune*, 367 N.W.2d

476, 491 (Minn. 1985). The district court found that Nelson's defamation claims

against Alvarado and the Bank failed as a matter of law because the statements

were subject to a qualified privilege that was not abused. Order at 15-19,ADD015-

019. These points will be discussed separately.

### 1. Defamation.

The elements of a defamation claim are: "(a) a false and defamatory statement

about the plaintiff; (b) in unprivileged to a third party; (c) that harmed the

plaintiff's reputation in the community. *Weinberger v. Maplewood Review*, 668

N.W.2d 667, 673 (Minn. 2003). [5]

The district court observed that "Alvarado accused Nelson of sexually harassing

her, which led to the termination of Nelson's employment. Alvarado's statements

were likely per se defamatory." Order at 16,ADD016. Statements are defamatory

per se if they include accusations of criminal behavior or moral turpitude and false

---

[5] Appellees did not argue the statements were true.

Appellate Case: 22-2827    Page: 48    Date Filed: 10/21/2022 Entry ID: 5210155

statements about a person's business, trade, professional conduct, or imputations of loathsome disease, and unchastity. *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019); *Anderson v. Kammeier*, 262 N.W.2d 366, 372 (Minn. 1977). Alvarado's statements accused Nelson of grabbing her breasts, wanting to take her into the bathroom and fuck her, and trying to French kiss her and her boyfriend at the bar, could be construed as criminal assault, sexual harassment, and unprofessional conduct in her business as a banker, and were defamatory *per se*. *Id.*

### 2. Qualified Privilege.

The district court found that the Bank and Alvarado were entitled to a qualified privilege for Alvarado's defamatory statements. Order at 15,ADD015. A communication, to be privileged, must be made upon a proper occasion, from a proper motive, and be based upon reasonable or probable cause. *Lewis v. Equitable Life Assur. Soc. of the U.S.*, 389 N.W.2d 876, 889 (Minn. 1986).

Whether an occasion is a proper one upon which to recognize a privilege is a question of law for the court to determine. *Lewis*, 389 N.W.2d at 889. The district court erroneously concluded that all of the defamatory statements made within the context of the Bank's internal investigation were entitled to a qualified privilege. Order at 18,ADD018.

43

This conclusion does not necessarily determine that the statements were privileged. *Lewis*, 389 N.W.2d at 890. A qualified privilege may be lost if it is abused. *Id*. While the initial determination of whether a communication is privileged is a question of law for the court to decide, the question of whether the privilege was abused is a jury question. *Id*. Abuse of the privilege can be shown by evidence of actual malice. *Lewis*, 389 N.W.2d at 890.

### 3. Actual Malice for Statements Made in the Course of Investigation.

### a. Alvarado's Complaint.

The district court erred granting summary judgment because Nelson presented evidence of actual malice by Alvarado from which a jury could find it abused the qualified privilege. Order at 18,ADD018.

Alvarado communicated defamatory statements to Plante and Roettger. Billingsley also learned of them. The statements were communicated to Raleigh.

Actual malice exists where the defendant "'made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.'" *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn. 2009). Malice may be proved by evidence "extrinsic" to the statement or by evidence "intrinsic" to the statement. *Id.; Friedell v. Blakely Printing Co.*, 203 N.W. 974, 976 (Minn. 1925)(stating that "extrinsic" evidence includes proof of personal ill feeling and "intrinsic" evidence includes "exaggerated language …," "the character

44

of the language used …," "the mode and extent of publication, and other matters in excess of the privilege").

Whether the privilege has been abused is a jury question. *Lewis*, 389 N.W.2d at 890. The district court erred by deciding questions of actual malice and abuse of qualified privilege. Order at 18,ADD018.

The district court erroneously concluded that "Alvarado's peer review does not contain any indication of personal ill feeling toward Nelson. The review pertains to Nelson's professional value as a bank employee and does not mention any of Alvarado's personal feelings toward Nelson." Order at 18,ADD018. The district court erroneously limited actual malice to evidence of personal animosity to show ill will by Alvarado towards Nelson and then wrongly weighed the evidence. *Id*.

The law does not require only evidence of personal animosity or feelings to prove malice in this context. *Bahr*, 766 N.W. 2d at 920; *Lewis*, 389 N.W.2d at 891; *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980). The law requires a showing of "ill will" that can occur in different contexts. "Personal" ill will is not required. *Id.* Ill will can be demonstrated in business and professional contexts like here. A reasonable jury could find Alvarado's defamatory statements about Nelson sexually harassing and assaulting her were motivated by professional ill will and improper motives.

45

In *Stuempges*, the plaintiff's new manager, Jones, criticized how he conducted his sales duties and approached work issues and made defamatory statements about him in a post-employment job reference. The statements referred to the plaintiff's reputation in his profession. *Stuempges*, 297 N.W.2d at 255. The Minnesota supreme court observed that "[o]ne of the underpinnings of Stuempges' case was that Jones was motivated by malice toward him and that the statements … were an attempt to blackball him in the profession." *Id.* at 258. Similarly, a reasonable jury could find that Alvarado's demeaning statements about Nelson in her peer review showed motivation to damage Nelson's reputation as a banker. A reasonable jury could find actual malice by the review to defeat qualified privilege.

The fact that Alvarado said she did not want Nelson terminated does not overcome other evidence of malice that should be weighed by a jury. Order at 18,ADD018. The district court erred weighing this evidence against evidence of malice presented by Nelson. Weighing evidence to determine whether the privilege is abused rests with the jury. *Lewis*, 389 N.W.2d at 890.

A jury could conclude that Alvarado's critical and demeaning statements about Nelson in her peer review reflected ill will towards Nelson and motive to berate her professional status, practices, and reputation as a banker to support malice. Alvarado made exaggerated, caustic, and critical remarks about Nelson in the review, calling her "absent-minded," "lazy," and demeaning her reputation she

46

contended hurt the image of the Bank. These statements show ill will towards Nelson and impugn her professional reputation. *Bahr*, 766 N.W.2d at 920-21. She made exaggerated comments about her arriving late to work, taking two and a half hour lunches, leaving early, and speaking in circles. She said "I'm not really sure what she does here because she's always either absent or absent-minded." She criticized that Nelson's "own issues and bar-room flaunts affect her personal life." APP070,R.Doc. 43,18, at 3. She said it was clear that Nelson's "personal life is becoming a factor against the Bank's overall image."[6] *Id*. Her maligning Nelson's demeanor, persona, and professional behavior in the workplace epitomizes ill will and shows actual malice. She emphasized she "strongly" believed action needed to be taken against Nelson. *Id*. Two months later Nelson was fired after Alvarado accused her of sexual harassment. A jury could find that Alvarado sought to disparage Nelson's standing at the Bank – and professional community – by accusing her of sexual harassment and assault in a public place. Her previous peer review insults and ill will showed actual malice towards Nelson. The district court erred by requiring that Nelson produce evidence of Alvarado's "personal feelings" about Nelson in concluding that her evidence of malice was insufficient. Order at 19,ADD019.

---

[6] A jury could construe these statement as evidence of personal or professional ill will.

Appellate Case: 22-2827      Page: 53      Date Filed: 10/21/2022 Entry ID: 5210155

The district court erred weighing Nelson's evidence of malice against the malice in *Bahr*. Order at 18,ADD018. The court found that Alvarado's professional statements about Nelson in the peer review "scathing," but did not rise to the level of malice in *Bahr* where the defendant referred to the plaintiff as "lazy fat f\*\*\*er". Order at 18,ADD018. A showing of severity level of malice is not required. Instead, evaluating evidence of actual malice to decide whether qualified privilege was abused is for the jury. *Lewis*, 389 N.W.2d at 890. The statements in *Bahr*, moreover, could be construed as professional ill will, like Alvarado's.

In *Bahr*, the defendant's use of exaggerated language about the plaintiff showed malice. The defendant referred to plaintiff as a "lazy, fat f\*\*\*er" in front of two other employees. *Bahr*, 766 N.W.2d at 920-921. *Bahr* observed that malice can be shown by direct proof of personal spite and determined the comment was relevant to the question of personal spite. *Id*. Evidence of the speaker expanding the comments beyond the scope of the complaint can also show intrinsic evidence of malice. *Id*. *Bahr* did not limit evidence of actual malice to personal ill will or spite.

A "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan*, 572 U.S. at 656. A court must view the evidence in the light most favorable to the opposing party. *Id.* at 657. The district court usurped the

48

jury's function by comparing and weighing Nelson's evidence to the malice in *Bahr*. *Lewis*, 389 N.W.2d at 890.

Alvarado volunteered an offensive rumor about Nelson offering male employees shots of liquor on her breasts at a company Christmas party that were false. Roettger included the offensive rumor in her report without asking Nelson. These statements support malice.

Roettger's report on Alvarado showed malice by including Alvarado's exaggerated language, rumors, and false statements. APP061,R.Doc. 43,24, at 1-4. These offensive and derogatory comments were unrelated to the events of September 21, 2018. She invited Alvarado to send her the derogatory peer review that she considered. A jury could find the derogatory comments in the report were derived from ill will towards Nelson at the Bank. Genuine issues of material fact exist on the question of malice and the district court erred grating summary judgment.

### b. The Bank's Internal Discussions.

The free-flowing statements by Alvarado in her meeting with Roettger were to make Nelson look bad and include anything she had heard. This was not investigating facts about the events at the bar, but an attempt to pile on anything into the report – whether verified or not – to make Nelson look bad reflecting ill will. Roettger included Alvarado's rumor and exaggerated statements in her report

49

that was the foundation for Billingsley and Raleigh to consider for Nelson's discharge. A jury could find the rumors and lies in the report were exaggerated statements and evidence of malice. The district court erred by weighing the evidence of malice in the internal discussions that rests with the jury and summary judgment was improper. *Lewis*, 389 N.W.2d at 890.

### 4. Statements Outside the Bank.

#### a. No Qualified Privilege.

The district court erred by finding that Alvarado's defamatory statements made to Mike Mazzara, Becky Mazzara, Armando Alvarado, Veronica Alvarado, and Brylen Mulvahill were entitled to qualified privilege. Order at 19,ADD019. The district court labeled these as "statements made to Alvarado's family." Order at 19,ADD019. Mulvahill was not family, but Alvarado's boyfriend. Alvarado's statements to them were not made from a proper motive or based on reasonable or probable cause and the district court erred creating a qualified privilege for her non-work communications not previously recognized by the Minnesota supreme court. *Id*. These publications of the defamatory statements were not privileged. Alvarado's publishing the defamatory statements outside her employment were not privileged. Alvarado's communicating the defamatory statements to family and friends about what to do was unnecessary because she could report the alleged harassment in accordance with the Bank's policies. APP101,R.Doc. 43,2, at 17.

50

She had the means for notifying the Bank of the alleged harassment by Nelson to the Director of Human Resources, the Human Resources Manager, or the President/CEO, and did so. *Id*. Further, president Raleigh testified the Bank's policy is not to discuss employee business with people outside the Bank. APP322,R.Doc. 43,62, at 17. Alvarado's statements about employee business with people outside the Bank in violation of the Bank's policy were not for a proper purpose and were not privileged. *Lewis*, 389 N.W. 2d at 889.

The district court erroneously concluded the statements to her boyfriend and other family members "concerned private interests" in granting them a qualified privilege. Order at 19,ADD019. A reasonable jury may conclude that Alvarado's defamatory statements were harmful to Nelson's reputation at the Bank and person in the community. The statements concerned Nelson's interests in her personal and professional reputation in the community - and harm to her reputation – that should be weighed by a jury. No Minnesota case grants a qualified privilege to make defamatory statements to third parties who happen to be family members or boyfriends.

Alvarado and the Bank waived qualified privilege for defamatory statements to family and friends under Federal Rule of Civil Procedure 8(c) by not raising it in their Answers. APP045,R.Doc. 7; APP053,R.Doc. 6. The waiver was amplified

Appellate Case: 22-2827    Page: 57    Date Filed: 10/21/2022 Entry ID: 5210155

by their not arguing the privilege in their moving papers for summary judgment.

T-16. Nelson was prejudiced by the inability to research and brief the issue.

The Minnesota supreme court has not extended qualified privilege for defamatory statements published to family and friends in this context. The district court recognized this concern at oral argument. No supreme court case was cited by the Bank or Alvarado. T-19. Neither sought certification to the Minnesota supreme court of the unresolved state law question of privilege for family or friends. *See In Re United Health Group Inc. Shareholder Derivative Litigation*, 754 N.W.2d 544, 549-50 (Minn. 2008); Minn. Stat. § 480.065, subd. 3. The district court erred creating a qualified privilege for family members and friends of the publisher of defamatory statements not recognized by the Minnesota supreme court.

The district court's reliance on dicta in *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 323, 328 (Minn. 2000) for qualified privilege for family and friends was erroneous. Order at 19,ADD019. *Moreno* was a media defamation case applying the fair report privilege and inapposite. Defeating the fair report privilege is not shown by commonlaw malice, but by showing that additional contextual material, not part of the proceeding, is added to a publication that conveys a defamatory impression or comments on the veracity or integrity of any party. *Id.* at 333. *Moreno* did not grant qualified privilege for private party

52

defamatory statements republished to family and friends. Adopting the rule applied by the district court would eviscerate many private party defamation claims.

Moreover, a jury could conclude that Alvarado's defamatory statements about Nelson grabbing her breasts at the bar, saying she wanted to take her into the bathroom and fuck her, trying to French kiss her and her boyfriend, licking her face, were not about her own affairs, but were about Nelson and Nelson's alleged unprofessional conduct. The false statements were about Nelson as her supervisor at the Bank – not Alvarado's private affairs. The statements were damaging to Nelson's reputation in the community and at the Bank. To grant qualified privilege for republishing defamatory statements to family and friends extends the privilege beyond its purpose.

Alvarado first published the defamatory statements to Mulvahill at the bar and stayed to socialize and drink. This was a public place and not a proper place or purpose protectible by a recognized privilege. It was not a discussion of private affairs.

She next published the defamatory statements to her mother, Becky Mazzara, and step-father, Mike Mazzara, at their home. Alvarado took the day off of work by misrepresenting to Nelson she may see her psychologist. When she returned to work she gave a different versions to Plante and Roettger. Alvarado

53

did not have a psychologist and fabricated this information. APP216,R.Doc. 43,15, at 87. Alvarado's day off work under false pretenses should not insulate her conversations with the Mazzaras by granting a qualified privilege.

She communicated the defamatory statements to her father, Armando Alvarado, and step-mother, Veronica Alvarado at their home. The day Nelson was discharged she exchanged text messages with her father about Nelson being fired to which he responded "Lmao," or laughing my ass off. APP079,R.Doc. 43,28, at 87; APP226,R.Doc. 43,15, at 125. Her communications with him were neither a proper purpose or occasion to warrant being privileged.

Alvarado said in her interview that she only talked to Mike Mazzara about the accusations and what she should do. APP062-63,R.Doc. 43,24, at 2-3. She did not tell Roettger about talking to her mother, Becky Mazzara, her father, Armando Alvarado, or step-mother Victoria Alvarado. She did not tell Roettger she told her boyfriend about the accusations. A jury could find these names were not mentioned to Roettger because she did not go to them to ask what she should do.

Unlike republications of defamatory statements made in the course of employment investigations or media reports, republications of defamatory statements to family and friends are not subject to corroboration and documentation. Employment investigations and media reports are documented and identifiable. Conversations with family and friends are not. Creating a qualified

privilege to defamatory statements to family and friends extends protection for defamatory statements beyond the purpose of the privilege. A family and friends privilege would allow publishers of defamatory statements to fabricate or embellish reasons for the publications to garner the privilege after being sued without corroboration and verification. Absent recordings, this may not be possible. The same person accused of the false statements should not then be believed without recourse to victims – like here. None of the qualified privileges for defamation are premised on the defendant's post-suit uncorroborated explanations. The privilege should not be so easily extended and when harm to a person's reputation is involved.

The doctrine of privileged communications rests upon public policy considerations. *Lewis*, 389 N.W.2d at 889. The existence of a privilege results from the court's determination that statements made in particular contexts or certain occasions should be encouraged despite the risk that the statements might be defamatory. *Id*. Whether an occasion is a proper one upon which to recognize a privilege is a question of law for the court to determine. *Id*. (citations omitted). Alvarado's publishing the defamatory statements about Nelson to family and boyfriend do not fit within the qualified privilege doctrine.

The *Restatement of Torts* discusses circumstances for qualified privilege for family relationships as follow:

> (1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that:
>
> > (a) there is information that affects the well-being of a member of the immediate family of the publisher, and
> > (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family.
>
> (2) An occasion makes a publication conditionally privileged when the circumstances induce a correct or reasonable belief that
>
> > (a) there is information that affects the well-being of a member of the immediate family of the recipient or of a third person, and
> > (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the well-being of the member of the family, and
> > (c) the recipient has requested the publication of the defamatory matter or is a person to whom its publication is otherwise within generally accepted standards of decent conduct.

*Restatement (Second) of Torts § 597* (1977). A person cannot avail himself of the privilege if he abuses it. *Id.*, cmt. a. None of these circumstances fit when Alvarado published the defamatory statements to her parents and step-parents. She had protective recourse available at the Bank by making a complaint pursuant to the Bank's policies. Republishing the statements outside the Bank was neither requested or necessary. Her mother taught at the high school and there was no evidence she had information about what steps to take. Mike Mazzara worked at the Bank, but did not direct her to follow its policies. He never reported Alvarado's statements to the Bank that Nelson harassed her and was not interviewed. No evidence was presented that communicating the defamatory statements to Armando and Victoria Alvarado would affect the well-being of

56

anyone in the family or that they had information on useful steps for protecting Alvarado to show a proper occasion.

The *Restatement of Torts* does not recognize qualified privilege for defamatory statements published to friends.

Alvarado would have had no reason to tell her boyfriend what Nelson did and said to her at the bar if he was there at the time. This illogical sequence raises doubt as to the believability of her story. The Minnesota supreme court has not recognized a qualified privilege to defamatory statements published to friends and the district court erred as a matter of law by creating a privilege for Alvarado's statements published to her boyfriend.

None of the communications of the defamatory statements by Alvarado outside of work were part of the Bank's investigation.

### b. Malice for Statements to Family and Friends.

Assuming *arguendo* that qualified privilege attached to Alvarado's defamatory statements to her parents, step-parents, and boyfriend, the district court erred by not considering Nelson's evidence of malice to defeat the privilege. Order at 19,ADD019. Weighing and evaluating evidence of actual malice to decide whether qualified privilege was abused is for the jury. *Lewis*, 389 N.W.2d at 890. The same malice to defeat qualified privilege of the Bank also defeats the qualified privilege to Alvarado's family and boyfriend.

Appellate Case: 22-2827    Page: 63    Date Filed: 10/21/2022 Entry ID: 5210155

Alvarado's initial defamatory statements to Mulvahill were at the bar. APP213,R.Doc. 43,15, at 76. Alvarado said she told Mulvahill outside and went back in with their friends. *Id.* The statements were not made in the conduct of her own affairs where only her interests were concerned nor were they part of a work investigation. No case grants qualified privilege for defamation published at a bar. She also discussed the statements with Mulvahill the next day. APP215,R.Doc. 43,15, at 82. A reasonable jury could find actual malice by these publications because her repeating the defamation to Mulvahill was unnecessary if he witnessed the events at the bar and summary judgment was improper. *Lewis*, 389 N.W.2d at 890.

Alvarado republished the defamatory statements to her mother, Becky Mazzara, and step-father, Mike Mazzara, on Monday, September 24 at their house. APP215,R.Doc. 43,15, at 83. They lived in the community their whole lives and Mike Mazzara worked at the bank several years. APP215,R.Doc. 43,15, at 84. He told Alvarado it was going to be her word against Nelson's and it is two girls drinking at a bar. *Id.* Mazzara was home for lunch but did not report her complaint to the Bank. APP216,R.Doc. 43,40, at 85; APP281,R.Doc. 43,40, at 61.

Alvarado's text exchange with Armando Alvarado portrayed Nelson in a bad light. These were not private family matters. Her father characterized Nelson's firing with "Lmao," or laughing my ass off. APP226,R.Doc. 43,15, at 125,

58

APP065,R.Doc. 43,28.  A reasonable jury could consider this as evidence of malice to defeat qualified privilege.

Viewing the evidence most favorable to Nelson, she presents evidence from which a jury could find malice to defeat the privilege. *Tolan*,  572 U.S. at 651. Alvarado's insults of Nelson in her peer review, false statements made in her interview, and unnecessary republication to her family and boyfriend, raise genuine issues of material fact as to malice to defeat qualified privilege.

## CONCLUSION

Because genuine issues of material fact exist on Nelson's MHRA and defamation claims, the summary judgment should be reversed and the case remanded for trial.

Respectfully submitted,

**STEPHEN C. FIEBIGER LAW OFFICE, CHARTERED**

Dated:  _October 20, 2022___          s/Stephen C. Fiebiger_____
                                                        Stephen C. Fiebiger (#0149664)
                                                        3000 West County Road 42, Suite 310
                                                        Burnsville, MN 55337
                                                        (952) 746-5171
                                                        Stephenfieblaw@gmail.com

                                                        **ATTORNEY FOR APPELLANT**

59

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Appellant certifies that except as set forth herein this brief complies with the type limitation of Rule 32 (a)(7)(B) and (C) and contains 12,992 words.  The font is 14 point Times New Roman. The following word processing software system was used to prepare this brief:  Microsoft Word Windows 10.  The brief and addendum have been scanned for viruses and are virus free.


Dated:  _October 20, 2022_____          s/Stephen C. Fiebiger_____
                                         Counsel for Appellant