**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

---

**No: 22-2827**

---

Heidi Nelson, formerly known
as Heidi Martin,

Appellant,

vs.

Lake Elmo Bank; and Olivia Alvarado,
individually and as an employee,

Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

**APPELLEES' BRIEF**

---

Ellen A. Brinkman (#0386578)
Erin C. Conlin (#0400036)
Gordon Rees Scully Mansukhani
100 S. Fifth Street, Suite 1900
Minneapolis, MN 55402
ebrinkman@grsm.com
econlin@grsm.com

**ATTORNEYS FOR APPELLEES**

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Appellant Heidi Nelson sued Appellee Lake Elmo Bank for allegedly violating the Minnesota Human Rights Act. Nelson alleged that Lake Elmo Bank discriminated against her on the basis of her sex when it terminated her employment. Additionally, Nelson sued both Appellees Lake Elmo Bank and Olivia Alvarado for defamation.

Appellees moved for summary judgment on all of Nelson's claims. The district court granted Appellees' summary judgment motion, finding that Nelson failed to come forward with evidence showing fact issues and holding that on the undisputed record evidence, Appellees were entitled to judgment as a matter of law.

The district court properly considered the undisputed record evidence in a light favorable to Nelson and drew reasonable inferences in her favor. The district court also correctly concluded that, on that record, Appellees were and are entitled to judgment as a matter of law. This Court should, therefore, affirm the district court's summary judgment order.

Oral argument will assist the Court in considering the issues involved in this case. Appellees request fifteen minutes to present their case.

Appellate Case: 22-2827    Page: 2    Date Filed: 11/28/2022 Entry ID: 5221603

## CORPORATE DISCLOSURE STATEMENT

Lake Elmo Bank is a Minnesota bank with its principal place of business located at 11465 39th Street North, in the city of Lake Elmo, state of Minnesota, County of Washington. Lake Elmo Bank is a wholly owned subsidiary of Lake Elmo Bancshares, Inc.  Lake Elmo Bancshares, Inc. is a Minnesota corporation and a one bank holding company.

Appellate Case: 22-2827     Page: 3     Date Filed: 11/28/2022 Entry ID: 5221603

# Table of Contents

**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT** ......i

**CORPORATE DISCLOSURE STATEMENT** ................................................... ii

**TABLE OF AUTHORITIES** ..............................................................................v

**JURISDICTIONAL STATEMENT** .................................................................1

**STATEMENT OF THE ISSUES** ......................................................................2

**STATEMENT OF THE CASE** ..........................................................................4

  A. The Parties ....................................................................................................4

  B. Lake Elmo's Bank's Policies ......................................................................5

  C. Nelson's Employment with Lake Elmo Bank .............................................9

  D. Alvarado's Report of Sexual Harrassment Against Nelson and Subsequent Investigation ...............................................................................................13

  E. Nelson's Termination ................................................................................17

  F. Allegations Regarding Other Employees ..................................................20

    1. Steven Madsen ......................................................................................20

    2. Barney Patterson ...................................................................................24

**SUMMARY OF THE ARGUMENT** ...............................................................26

**STANDARD OF REVIEW** .............................................................................28

**ARGUMENT** ...................................................................................................30

  I.    NELSON FAILED TO MEET HER BURDEN OF DEMONSTRATING TRIABLE FACT ISSUES REGARDING WHETHER LAKE ELMO BANK'S REASON FOR TERMINATING HER EMPLOYMENT WAS PRETEXTUAL ..............................................................................................................30

    A.  Nelson Failed to Establish a Prima Facie Case ...........................................30

    B.  Nelson Failed to Establish Pretext ...............................................................32

      1. *The Bank's investigation was thorough and prompt* ................................35

      2. *Alvarado's alleged "inconsistencies" are innocuous* ..............................37

      3. *The Bank followed its internal policies* ...................................................38

      4. *Nelson failed to identify a proper comparator* .........................................40

      5. *The Bank's reason for terminating Nelson's employment* .......................44

Appellate Case: 22-2827    Page: 4    Date Filed: 11/28/2022    Entry ID: 5221603

II. NELSON FAILED TO ESTABLISH THE EXISTENCE OF A DEFAMATORY STATEMENT BECAUSE A QUALIFIED PRIVILEGE PROTECTS EACH OF THE STATEMENTS AT ISSUE ..................................45

A. Nelson's Defamation Claim Against the Bank Fails Because She is Unable to Establish Publication ....................................................................................45

B. Qualified Privilege protects statements made during an employment investigation ...........................................................................................46

C. There is no evidence of actual malice as to the statements made during the employment investigation ....................................................................49

D. Nelson's defamation claim against Alvarado is based on statements she made to family members also fails ...................................................52

**CONCLUSION** .........................................................................................**54**

**CERTIFICATE OF COMPLIANCE** .............................................................**57**

Appellate Case: 22-2827     Page: 5     Date Filed: 11/28/2022 Entry ID: 5221603

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Fairview Health Servs., Inc.,* No. A07-1481, 2008 WL 3289269, at *6 (Minn. Ct. App. Aug. 12, 2008) ..............................................................35

*Anderson*, 88 F. Supp. at 984 ..................................................... 28, 32, 34

*Antonich v. U.S. Bank Nat'l Ass'n*, No. 14-CV-710 SRN/HB, 2015 WL 4771551, at *16 (D. Minn. Aug. 13, 2015) ..........................................................41

*Bahr v. Boise Cascade Corp*., 766 N.W.2d 910, 921 (Minn. 2009).......................51

*Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997) ......................................47

*Bone v. G4s Youth Servis., LLC*, 686 F.3d 948 (8th Cir. 2012) ................... 2, 34, 40

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) ...................................28

CIV. 00-2741 ADMSRN, 2002 WL 273141, at *3 (D. Minn. Feb. 25, 2002) .......48

*Davenport v. Univ. of Ark. Bd. of Trs.,* 553 F.3d 1110, 1113 (8th Cir. 2009).........28

*Doucette v. Morrison Cty.*, 763 F.3d 978, 983 (8th Cir. 2014) ..............................41

*Elnashar v. Speedway SuperAmerica, LLC,* 484 F.3d 1046, 1055 (8th Cir. 2007).31

*Ewald v. Wal–Mart Stores, Inc*., 139 F.3d 619, 623 (8th Cir.1998).......................47

*Fry v. Parcelite Sols.*, 502 F. App'x 631, 632 (8th Cir. 2013).................................33

*Goins v. W. Grp.,* 635 N.W.2d 717, 724 (Minn. 2001) ...........................................30

*Goncalves v. Plymouth Cty. Sheriff's Dep't*, 659 F.3d 101, 106 (1st Cir. 2011).....40

*Haigh v. Gelita USA, Inc.*, 632 F.3d 464 (8th Cir. 2011) ............................. 2, 34, 35

Appellate Case: 22-2827    Page: 6    Date Filed: 11/28/2022 Entry ID: 5221603

*Hansen v. Robert Half Int'l, Inc.,* 813 N.W.2d 906, 918 (Minn. 2012)...................30

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) .................................................30

*Hebner v. Great N. Ry. Co*., 78 Minn. 289, 80 N.W. 1128, 1129 (1899)................47

*Hunt v. Univ. of Minn*., 465 N.W.2d 88, 93 (Minn. 1991) ......................................49

*Johnson v. AT&T Corp.*, 422 F.3d 756 (8th Cir. 2005).......................................2, 36

*Jones v. Keith*, No. 00-2741, 2002 WL 273141 (D. Minn. Feb. 25, 2022).........3, 47

*Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995) ...........................28

*Lake v. Yellow Transp., Inc.*, 596 F.3d 87 (8th Cir. 2010) ........................................2

*Lee v. Metro. Airport Commn.,* 428 N.W.2d 815 (Minn. App. 1988)....................48

*Lewis v. Eq. Life Assur. Soc. of the U.S*., 389 N.W.2d 876, 890 (Minn. 1986).......47

*McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371 (Minn. 1975) ....................3, 49

*McDonnell Douglas Corp. v. Green,* 311 U.S. 792 (1973) .....................................30

*Michaelson v. Minnesota Min. & Mfg. Co*., 474 N.W.2d 174, 182 (Minn. App.

    1991) .......................................................................................................................49

*Moreno v. Crookston Times Printing Co.*, 610 N.W. 2d 321 (Minn. 2000)  3, 46, 54

*Palmisano v. Allina Health Systems, Inc.*, 190 F.3d 881 (8th Cir. 1999).................3

*Ramlet v. E.F. Johnson Co.,* 507 F.3d 1149, 1153 (8th Cir. 2007) .........................28

*Rasmussen v. Two Harbors Fish Co.,* 832 N.W.2d 790, 795 (Minn. 2013) ...........30

*Ray v. Miller Meester Adver., Inc.,* 664 N.W.2d 355, 367 (Minn. Ct. App. 2003).30

*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000) .................32

Appellate Case: 22-2827    Page: 7    Date Filed: 11/28/2022 Entry ID: 5221603

*Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008)....................................34

*Scott Fetzer Co. v. Williamson*, 101 F.3d 549, 555 (8th Cir. 1996) ........................50

*Sherman v. Rinchem Co.*, 687 F.3d 996, 1010 (8th Cir. 2012) ...............................50

*Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001) ................................................................................................................35

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993) ...............................34

*Stuart v. Gen. Motors Corp.,* 217 F.3d 621, 637 (8th Cir. 2000) ...........................34

*Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980)................49

*Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ........................33

*Vincent v. Roundy's, Inc.,* No. 05-2995, 2007 WL 2226029, at *5 (D. Minn. July 31, 2007) ..................................................................................................................35

*Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003) ..............45

*Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004) ..............................33

**Statutes**

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 1332 ...........................................................................................................1

**Rules**

Fed. R. App. P. 4(a)(1)..................................................................................................1

Fed. R. Civ. P. 56(c)....................................................................................................27

Appellate Case: 22-2827    Page: 8    Date Filed: 11/28/2022 Entry ID: 5221603

## JURISDICTIONAL STATEMENT

Nelson seeks review from the August 1, 2022 final judgment of the United States District Court for the District of Minnesota, the Honorable John R. Tunheim presiding, and July 29, 2022 order granting Lake Elmo Bank and Olivia Alvarado's motion for summary judgment. The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because Nelson is a citizen of Wisconsin and Lake Elmo Bank and Olivia Alvarado are citizens of Minnesota.

Nelson filed a notice of appeal dated August 25, 2022. Fed. R. App. P. 4(a)(1). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

Appellate Case: 22-2827    Page: 9    Date Filed: 11/28/2022 Entry ID: 5221603

## STATEMENT OF THE ISSUES

1. **Did the district court err when it concluded that Nelson failed to establish that Lake Elmo Bank's proffered reason from terminating Nelson's employment was pretextual?**

   No. The district court correctly concluded that the record evidence stablished that Lake Elmo Bank had a legitimate non-discriminatory reason for terminating Nelson's employment. The district court also correctly concluded that the three methods by which Nelson attempted to establish pretext all failed as a matter of law.

   **Authorities:**

   *Haigh v. Gelita USA, Inc.*, 632 F.3d 464 (8th Cir. 2011)

   *Johnson v. AT&T Corp.*, 422 F.3d 756 (8th Cir. 2005)

   *Lake v. Yellow Transp., Inc.*, 596 F.3d 87 (8th Cir. 2010)

   *Bone v. G4s Youth Servis., LLC*, 686 F.3d 948 (8th Cir. 2012)


2. **Did the district court err when it concluded that Nelson failed to establish defamation claims against both Lake Elmo Bank and Olivia Alvarado because all of the alleged defamatory statements were subject to a qualified privilege?**

   No. The district court correctly concluded that Nelson's defamation claims against Lake Elmo Bank and Olivia Alvarado failed as a matter of law because the alleged defamatory statements were subject to a qualified privilege.

2

**Authorities:**

*Palmisano v. Allina Health Systems, Inc.*, 190 F.3d 881 (8th Cir. 1999)

*McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371 (Minn. 1975)

*Jones v. Keith*, No. 00-2741, 2002 WL 273141 (D. Minn. Feb. 25, 2022)

*Moreno v. Crookston Times Printing Co.*, 610 N.W. 2d 321 (Minn. 2000)

Appellate Case: 22-2827   Page: 11   Date Filed: 11/28/2022 Entry ID: 5221603

<u>**STATEMENT OF THE CASE**</u>[1]

**A. The Parties**

Lake Elmo Bank ("LEB") is an independent, locally-owned, and employee-owned community bank that was chartered in 1911. Aple APP148-149, R. Doc. 38-2 at 26-27.[2] Today, LEB has grown to include three, physical branches in Lake Elmo, Oakdale, and Stillwater. Aple APP190, R. Doc. 38-3 at 2, ¶ 4; Aple APP114, R. Doc. 38-1 at 107. LEB is committed to the local community it serves and is dedicated to providing the same customer service that has been passed through generations. Aple APP148, R. Doc. 38-2 at 26.

Heidi Nelson ("Nelson") began her employment with LEB as a Teller in 1985. Aple APP190, R. Doc. 38-3 at 2, ¶ 4. During her time at LEB, Nelson was promoted to the position of Lead Teller, Assistant Cashier and later Assistant Vice President ("AVP") of Teller Services. (*Id*.) Nelson also served as an Officer of LEB. Aple APP022, R. Doc. 38-1 at 9. As the AVP of Teller Services, the final position Nelson

---

[1] Pursuant to Federal Rule of Appellate Procedure 30, Appellant "must, within 14 days after the record is filed, serve on the appellee a designation of the parts of the record the appellant intends to include in the appendix and a statement of the issues the appellant intends to present for review." Appellant failed to do so. Appellees never received any such notice and thus were unable to contribute additional parts of the record which they wished to direct the Court's attention. As such, Appellees had no choice but to create their own Appendix that includes portions of the record they which to rely on. Appellees' Appendix is filed herewith.

[2] Citations to "Aple App. ##" are to the Appellees' Appendix and refer to the page number included therein.

4

held before her termination, she led and supervised the teller line at LEB's main bank branch in Lake Elmo, MN. *Id*. at Aple APP023, R. Doc. 38-1 at 10; Aple APP024, R. Doc. 38-1 at 11.

Olivia Alvarado was hired as a Teller by LEB in 2013. Aple APP048, R. Doc. 46-1 at 51. At that time, Alvarado was in high school and worked part time. *Id*. After she graduated, Alvarado joined the bank as a full-time teller. Aple APP061, R. Doc. 38-1 at 45. During the time Alvarado worked as a Teller at LEB, her direct supervisor was Nelson. *Id*.; Aple APP059, R. Doc. 38-1 at 43. In 2018, at the time Nelson was terminated, Alvarado was 22 years old. Aple APP056, R. Doc. 38-1 at 40. Alvarado is still employed by LEB and works as an Operations Support Assistant. Aple APP057-058, R. Doc. 38-1 at 41-42.

## B. Lake Elmo Bank's Policies

LEB is committed to providing equal employment opportunities and complying with applicable equal opportunity laws and regulations. Aple APP152, R. Doc. 38-2 at 30. To that end, LEB has detailed policies in place in its Employee Handbook that were prepared with the assistance of counsel at the law firm of Fredrikson & Byron, P.A. Aple APP098, R. Doc. 38-1 at 74.

The Equal Employment Opportunity ("EEO") Policy states, "Lake Elmo Bank does not discriminate in employment opportunities or practices on the basis of…sex…" Aple APP152, R. Doc. 38-2 at 30. LEB's policy further prohibits the

Appellate Case: 22-2827    Page: 13    Date Filed: 11/28/2022 Entry ID: 5221603

harassment of applicants and employees because of their protected class status, including sex. LEB requires all employees to adhere to its EEO policy. (*Id*.) The policy further states that "employment decisions will be made only on the basis of job-related requirements and in support of [LEB's] commitment to equal employment opportunity." (*Id*.) LEB ensures that all personnel actions are administered "without regard to gender" and "that only valid job requirements are used in making all employment decisions." (*Id*.) Under the policy, all employment practices, including disciplinary action and termination, are free of prohibited discrimination. (*Id*.)

LEB has also appointed an EEO Officer to oversee and monitor the implementation of the EEO policy as well as LEB's Affirmative Action Program for Women and Minorities. (*Id*.) "Any applicant or employee with questions or concerns about discrimination or harassment in the workplace is encouraged to bring these issues to the attention of the EEO Officer or his/her Group Leader or Supervisor." (*Id*.)

LEB also has a specific policy prohibiting sexual harassment and discrimination in the workplace. Aple APP159-160, R. Doc. 38-2 at 37-38. LEB's policy states, "[i]t is the policy of Lake Elmo Bank to abide by the federal, state, and local laws that prohibit sexual harassment and to maintain an employment atmosphere free of sexual harassment. Sexual harassment of any employee will not

be tolerated. (*Id.*).

LEB has implemented reporting procedures in the event an employee feels they are being subjected to sexual harassment. Employees are instructed to promptly report the conduct to their group leader or supervisor. (*Id.*) If the employee's supervisor is participating in the suspected behavior, employees are instructed to report it to senior management officials.

LEB reserves the right to determine whether the reported conduct violates their policies. "If investigation of a complaint of alleged sexual harassment, other alleged unlawful harassment or alleged discrimination produces evidence of inappropriate behavior, appropriate disciplinary action will be taken, up to and including, unpaid suspension and/or immediate termination of employment." (*Id.*) LEB also prohibits retaliation of any kind for reporting an incident of unlawful sexual harassment. (*Id.*)

Employees at LEB receive annual training regarding these policies. Aple APP075, R. Doc. 38-1 at 66; Aple APP077-078, R. Doc. 38-1 at 89-90. The trainings are mandatory for all employees and include online courses. (*Id.*). Moreover, LEB maintains a HR department that, in 2018, included Julie Roettger, HR Manager, and Rebecca Billingsley, Vice President and HR Director. Both individuals have extensive experience working in HR and regularly attend training on discrimination and sexual harassment. Aple APP077-078, R. Doc. 38-1 at 89-90; Aple APP094-

7

097, R. Doc. 38-1 at 70-73. HR conducts investigations of employee complaints, they are trained to do so, and they rely on materials outside of the employee handbook when investigating. (*Id.*).

LEB has a practice of not involving non-employees in internal investigations. Aple APP107-108, R. Doc. 38-1 at 82-83. Nothing in LEB's employee handbook compels LEB to involve non-employees in internal investigations. Aple APP144-188, R. Doc. 38-2 at 22-66. Billingsley's undisputed testimony is that LEB has a practice of keeping employment matters confidential, and certainly has an interest in reducing the risk of defamation claims. Aple APP107-108, R. Doc. 38-1 at 82-83. Moreover, LEB has a practice of relying on the advice of counsel when conducting employment investigations. Aple APP106, R. Doc. 38-1 at 81.

Billingsley is also designated at LEB's EEO Officer. Aple APP152, R. Doc. 38-2 at 30; Aple APP094-095, R. Doc. 38-1 at 70-71. Billingsley is responsible for overseeing the EEO program and is also designated as a person to whom employees can report concerns related to harassment. (*Id.*). Billingsley is an attorney who is licensed to practice law in Minnesota and she regularly attends employment law seminars. Aple APP093, R. Doc. 38-1 at 69; Aple APP096, R. Doc. 38-1 at 72.

Other than the complaint of sexual harassment made by Defendant Alvarado *against* Plaintiff Nelson in 2018, LEB is unaware of any other complaints of sexual harassment made by or against any other employee of the Bank, male or female.

8

Aple APP101, R. Doc.38-1 at 77; Aple APP103-104, R. Doc. 38-1 at 79-80; Aple APP127, R. Doc. 38-2 at 3; Aple APP138, R. Doc. 38-2 at 13.

### C. Nelson's Employment with Lake Elmo Bank

Nelson was a long-time employee of LEB, beginning her career in 1985 as a Teller. Aple APP190, R. Doc. 38-3 at 3, ¶ 4. At the time of her termination, Nelson was the AVP of Teller Services. Aple APP021, R. Doc. 38-1 at 8. She had held this position since 2005. Aple APP200, R. Doc. 38-3 at 14; Aple APP023, R. Doc. 38-1 at 10. Nelson was also an Officer of LEB. Aple APP022, R. Doc. 38-1 at 9.

In 2018, Nelson's supervisor was Anne Plante, Vice President Retail Banking Manager. Aple APP025, R. Doc. 38-1 at 12; Aple APP113, R. Doc. 38-1 at 106. The record evidence is undisputedly clear that Nelson reported directly to Plante, including the following:

- Nelson repeatedly admitted in her deposition that Plante was her supervisor. Aple APP005, R. Doc. 46-1 at 32 (twice referred to Plante as "my supervisor") Aple APP006, R. Doc. 46-1 at 37 ("Anne was my direct supervisor"); Aple APP007, R. Doc. 46-1 at 38(stating Plante was her supervisor in 2017) Aple APP008-009, R. Doc. 46-1 at 39-40 (referring to Plante as "my supervisor"; Aple APP011, R. Doc. 46-1 at 42 (same); Aple APP012, R. Doc. 46-1 at 43 (same); Aple APP110, R. Doc. 46-1 at 41 (stating that Raleigh told her that Plante was her supervisor); Aple APP025, R. Doc. 38-1 at 12 (admitting that Plante was her supervisor in 2017 and 2018 and completed her reviews); Aple APP026-027, R. Doc. 46-1 at 46,_R. Doc. 38-1 at 13 (stating Plante became her supervisor in 2015); Aple APP036, R. Doc. 46-1 at 49 (admitting Plante was her supervisor in 2017)).

- Plante testified that she was Nelson's supervisor. Aple APP115, R. Doc. 46-1 at 63.

- Billingsley testified that Plante was Nelson's supervisor. Aple APP104-105, R. Doc. 38-1 at 80, R. Doc. 46-1 at 17.

- Roettger testified that Plante was Nelson's supervisor. Aple APP079, R. Doc. 46-1 at 5.

- Raleigh testified that Plante became Nelson's supervisor. Aple APP133-134, R. Doc. 46-1 at 72-73.

- Alvarado testified that Plante was Nelson's supervisor. Aple APP064, R. Doc. 46-1 at 77.

- Nelson's annual performance reviews in 2017 and 2018 were conducted by Plante. Aple APP025, R. Doc. 38-1 at 12; Aple APP203-206, R. Doc. 38-3 at 20-21; R. Doc. 38-3 at 23-24.

- After Nelson made a complaint about Plante in 2017 and the investigation was completed, it was decided that Plante would <u>continue</u> to supervise Nelson. Aple APP120, R. Doc. 46-1 at 64; Aple APP144-188, R. Doc. 38-2 at 22-66.

In short, each and every one of the relevant witnesses deposed in this case, including Nelson herself, testified that Nelson reported to Plante. Any argument that Nelson makes to the contrary in her brief is disingenuous and contradicted by all record evidence.

In the years leading up to Plaintiff's termination, complaints about her behavior and management style increased. For example, in June 2015, Plaintiff received a written, disciplinary memorandum from her supervisor Plante regarding performance issues, her responsibilities as a supervisor, and expectations moving forward. Aple APP201, R. Doc. 38-3 at 16. This memorandum noted that the mood in the Bank as "much lighter and happier" when Plaintiff was not in the office and that the "stress level" among employees was heightened when she was in the office.

10

(*Id*.) LEB took these issues very seriously. Indeed, Nelson attended a meeting to discuss her behavior and the contents of this memorandum with her supervisor, Plante, but also with the head of Human Resources, Rebecca Billingsley, and the President of the Bank, Dan Raleigh. Aple APP027, R. Doc. 38-1 at 13.

In March 2017, Plaintiff received another written warning from Billingsley about inappropriate conversations in the workplace and making derogatory comments about the bank and its employees. Aple APP202, R. Doc. 38-3 at 18. The warning states, "[t]his conversation is similar to conversations that we have heard about in the past where you have made derogatory comments about the bank and bank management. These comments are unacceptable." (*Id*.) The warning further states that Nelson is expected to behave in a professional manner, keep information confidential, and refrain from gossip and name calling. (*Id*.) LEB also included a notice that "any future warnings may result in disciplinary actions up to and including termination of employment." (*Id*.) This memorandum was presented to Nelson by Billingsley and Raleigh. Aple APP028-029, R. Doc. 38-1 at 14-15. Nelson understood that following the receipt of this warning, if she had future performance issues or warning, it would result in her termination. Aple APP030, R. Doc. 38-1 at 16.

Nelson received a performance review from in August 2017. Aple APP203-204, R. Doc. 38-3 at 20-21. Her evaluation notes that she needs to "be equally

respectful to all customers and co-workers" and to refrain from sharing confidential and personal employee and customer information with anyone other than authorized individuals. (*Id.*). Nelson admits that these were criticisms of her performance by her supervisor. Aple APP031-032, R. Doc. 38-1 at 17-18. Plante testified that these comments related to a number of incidents including Nelson referring to other employees as "stupid" on multiple occasions, Nelson telling others that an employee was "exhibiting early signs of dementia and could no longer teller," and making derogatory comments about a customer being "filthy and gross and dirty." Aple APP121-122, R. Doc. 38-1 at 113-114.

Nelson's 2018 performance review, dated two months prior to her termination, had nearly identical remarks directing Nelson to focus on being respectful of all customers and co-workers and keeping personal conversation to a minimum. Aple APP205-206, R. Doc. 38-3 at 23-24. Plante testified in her deposition that "it was frustrating for me that [Nelson's] performance issues did not improve when she was given direction." Aple APP119, R. Doc. 38-1 at 112. In her 2018 review, Nelson again was instructed to restrict sharing confidential and personal employee and customer information with anyone other than human resources or her supervisor. (*Id.*). Nelson admits that these were criticisms of her performance by her supervisor. Aple APP033-034, R. Doc. 38-1 at 19-20. Nelson further testified at her deposition that she disagreed with her supervisor's criticisms

and that it was her subjective belief that she did not need to improve in the areas specifically mentioned in her performance reviews. Aple APP035, R. Doc. 38-1 at 21.

### D. Alvarado's Report of Sexual Harassment Against Nelson and Subsequent Investigation

On September 25, 2018, Alvarado made a report to LEB that she had been sexually harassed by Nelson at the Harbor Bar in Stillwater, Minnesota on September 21, 2018. Aple APP068, R. Doc. 38-1 at 52. Initially, Alvarado met with Anne Plante but, before she could complete her report, Plante stopped the meeting so Alvarado could instead complete her report to Human Resources. Aple APP068-070, R. Doc. 38-1 at 52-54; Aple APP116-118, R. Doc. 38-1 at 109-111. Plante then escorted Alvarado to the office of Julie Roettger, LEB's Human Resources Manager. (*Id.*). Consistent with its policies against sexual harassment, LEB immediately commenced an investigation in response to Alvarado's report.

Roettger first met with and interviewed Alvarado on September 25, 2018 concerning the alleged incident. Aple APP080-082, R. Doc. 38-1 at 91-93. Only Roettger and Alvarado were in this meeting. (*Id.*). Roettger took handwritten notes during this meeting which she later typed up to include in the investigation file. Aple APP083, R. Doc. 38-1 at 94; Aple APP207-210, R. Doc. 38-3 at 26-29. Alvarado testified that the notes accurately reflect what she told Roettger during their meeting. Aple APP070- a-f, R. Doc 38-1 at 56-61.

13

Alvarado told Roettger that she and her boyfriend were at a bar with a group of friends on Friday, September 21, 2018, and that they had seen Nelson and her boyfriend at the bar. Aple APP207-210, R. Doc. 38-3 at 26-29. Alvarado further reported that Nelson approached her at the bar and began having a conversation her. (*Id.*). During their conversation, Alvarado told Roettger that Nelson grabbed Alvarado's breasts and that Nelson said to her: "I'd like to take you in the bathroom and fuck you." *Id.*; Aple APP082, R. Doc. 38-1 at 93. Alvarado reported that Nelson appeared intoxicated and was laughing through this encounter. Aple APP207-210, R. Doc. 38-3 at 26-29. Alvarado reported that Nelson approached her again shortly thereafter and asked her and her boyfriend if they wanted to go to a strip club. (*Id.*). Alvarado further reported that Nelson tried to "put her tongue in Alvarado's mouth (trying to French kiss her) but [Alvarado] kept turning her face away so [Nelson] actually ended up licking [Alvarado's] face." (*Id.*). Alvarado also reported that Nelson tried to do the same thing to Alvarado's boyfriend. (*Id.*).

As a result of this incident, Alvarado told Roettger that she was very uncomfortable and that she did not go into work the following Monday, September 24, 2018. *Id.*; Aple APP071, R. Doc. 38-1 at 62. Alvarado testified in her deposition that over the weekend she discussed what had happened at the Harbor Bar with her boyfriend, whom she lives with, and with her parents to decide whether she should make a report to anyone at LEB. Aple APP065-066, R. Doc. 38-1 at 49-50. Alvarado

testified that she did not discuss what had happened with anyone else. (*Id.*). On Sunday night, September 23, 2018, Alvarado sent a text message to Nelson stating that she had anxiety and would not be into work the following day. Aple APP207-210, R. Doc. 38-3 at 26-29. Alvarado also told Roettger that she feared retaliation from Nelson and requested that she be moved off of the teller line or to a different office so she would not need to interact with Nelson at work. Aple APP071, R. Doc. 38-1 at 62.

After interviewing Alvarado, LEB continued its investigation by meeting with Nelson on September 26, 2018. Aple APP088, R. Doc. 38-1 at 100; Aple APP211-213, R. Doc. 38-3 at 31-33. Both Roettger and Billingsley conducted this interview. Aple APP086, R. Doc. 38-1 at 97. No one else was present in the meeting. Roettger again took notes, which she later typed up to include in the investigation file. Aple APP211-213, R. Doc. 38-3 at 31-33. During this meeting, Roettger and Billingsley repeated what Alvarado had reported in questioning Nelson about the allegations. Aple APP089-090, R. Doc. 38-1 at 101-102. Roettger noted that while Nelson "did not directly admit" that Alvarado's allegations were true, Nelson stated that there was a "history of things like this between her and [Alvarado]" and further claims "that this behavior was not unusual for both of them when they hang out outside of work." Aple APP211-213, R. Doc. 38-3 at 31-33. Nelson recognized, however, that this kind of behavior was probably not a good idea as Alvarado's direct supervisor.

Appellate Case: 22-2827    Page: 23    Date Filed: 11/28/2022 Entry ID: 5221603

(*Id*.)

At the end of this meeting, Billingsley and Roettger told Nelson that Alvarado would be working in a different area of the bank and that Nelson would not be conducting Alvarado's performance review. (*Id*.). Such measures were taken in accordance with LEB's sexual harassment policy which aims to protect employees who make reports from any potential retaliation. Aple APP160, R. Doc. 38-2 at 38. Prior to meeting with Nelson, LEB had not decided what action was going to be taken, if any, concerning Nelson. Aple APP086-087, R. Doc. 38-1 at 97-98. During the investigation, LEB consulted its sexual harassment policy to make sure that it was being followed. Aple APP106, R. Doc. 38-1 at 76. LEB also consulted with counsel "to ensure that it was following all the proper steps and procedure." (*Id*.).

Billingsley and Roettger also discussed whether there were any other witnesses that needed to be interviewed as part of the investigation. Aple APP107, R. Doc. 38-1 at 82. Both Alvarado and Nelson had identified non-employees who were present at the Harbor Bar on the night of the alleged incident. Aple APP207-213, R. Doc. 38-3 at 26-29. It was decided that no further interviews were to be conducted. Billingsley testified that: "all of our employee matters are very confidential and we do not go outside of our employees to interview other people." Aple APP107, R. Doc. 38-1 at 82. When questioned further about why LEB did not interview non-employees as part of its investigation, Billingsley testified: "we were

16

worried about sharing employee confidential information, because we certainly didn't want a claim about defamation. [Nelson] seems to be concerned about that but on the other hand she wanted us down at the local bar interviewing people." Aple APP110, R. Doc. 38-1 at 85.

After completing the investigation, and in consultation with counsel, LEB determined that Alvarado's allegations were credible. *Id.* In addition, although Nelson did not admit or deny the allegations, she confirmed that some type of inappropriate behavior had occurred between herself and Alvarado. Aple APP211-213, R. Doc. 38-3 at 31-33. As a result, LEB concluded that Nelson was in violation of LEB's sexual harassment policies and decided to terminate Nelson's employment. Aple APP108, R. Doc. 38-1 at 83.

### E. Nelson's Termination

On October 2, 2018, LEB terminated Nelson's employment. Aple APP050, R. Doc. 38-1 at 33. Nelson was informed of her termination in a meeting with Billingsley, Roettger, and Raleigh. (*Id.*). That same day, LEB provided a memorandum to Alvarado informing her that the investigation into her allegations was complete and that LEB had taken appropriate actions in response. Aple APP072-073, R. Doc. 38-1 at 63-64; Aple APP214, R. Doc. 38-3 at 35. The memorandum also stated that LEB could not discuss the details of the investigation further. (*Id.*).

17

LEB treated the investigation and its decision to terminate Nelson's employment as confidential and "did not share that with anybody." Aple APP109, R. Doc. 38-1 at 84; *see also* Aple APP091, R. Doc. 38-1 at 103; Aple APP135-136, R. Doc. 38-2 at 11-12; Aple APP128-129, R. Doc. 38-2 at 4-5. While LEB informed other employees that Nelson was no longer with the bank, it did not communicate that Nelson had been involuntarily terminated. (*Id.*). Two internal emails were sent on the day of Nelson's termination informing employees that Nelson was no longer employed by LEB. Aple APP215-216, R. Doc. 38-3 at 37 and 39. One email was sent by Raleigh to just management-level employees and read, in its entirety, as follows:

Mgmt Team –

Just a quick heads up on a very confidential employee matter. As of today, Heidi Martin will no longer be employed at the bank. Anne will temporarily take over her duties. If employees ask about the situation, please indicate that all you can share is that she is no longer at the bank. Thank you for your support and keeping this confidential.

If you have further questions see Becky or Julie

Dan

Aple APP215, R. Doc. 38-3 at 37. The same day, Plante sent an email to the tellers at the Lake Elmo branch that read, in its entirety, as follows:

Aple APP216, R. Doc. 38-3 at 39.

Nelson testified in her deposition that the statements made in these emails concerning her no longer being employed at the bank were both true and accurate. Aple APP052-053, R. Doc. 38-1 at 35-36. Nelson further testified that she had never seen either of these emails before and also confirmed that she had never seen any other email in which her departure from the bank was discussed. Aple APP051, R. Doc. 38-1 at 34; Aple APP053-054, R. Doc. 38-1 at 36-37. Nevertheless, Nelson testified that the emails that were sent out "saying that I was no longer an employee," were "defamatory." Aple APP002-003, R. Doc. 38-1 at 3-4.[3]

Alvarado testified in her deposition that she discussed the incident at the Harbor Bar with her boyfriend, parents, and with Human Resources at LEB. She further stated: "I didn't want to bring it up to a bunch of people. I mean, I wanted to go to my parents for advice." Aple APP067, R. Doc. 38-1 at 51. When others would ask Alvarado if she knew what happened with Nelson, Alvarado testified that she would say "I don't know what happened but that she didn't work at the bank anymore." Aple APP074, R. Doc. 38-1 at 65.

---

[3] Notably, Nelson testified that the emails were "defamatory" before she had ever seen a copy of the emails. Aple APP002-003, R. Doc. 38-1 at 3-4. Nelson was not shown a copy of the actual emails until later in her deposition and she admitted the statements contained therein were true. Aple APP051-054, R. Doc. 38-1 at 34-37.

Appellate Case: 22-2827    Page: 27    Date Filed: 11/28/2022 Entry ID: 5221603

It is undisputed the Nelson has no personal knowledge of any other statement make by LEB or its employees, including Alvarado, about the circumstances of her termination or Alvarado's allegations.

## F. Allegations Regarding Other Employees

### 1. Steven Madsen

Steve Madsen, Vice President Investment Services, is the head of the Investment Department at LEB. Aple APP123, R. Doc. 38-1 at 115; Aple APP101-102, R. Doc. 38-1 at 77-78. He has been at the Bank for many decades. Aple APP102, R. Doc. 38-1 at 78; Aple APP131, R. Doc. 38-2 at 9. He reports directly to the Bank's President and CEO. Aple APP130, R. Doc. 38-2 at 8. Nelson did not report to Madsen or Raleigh. Aple APP025, R. Doc. 38-1 at 12. Nelson has never alleged that Madsen treated her inappropriately, harassed her, or discriminated against her in any way.

The undisputed record evidence is that no employee ever made a complaint of sexual harassment against Madsen. Aple APP103, R. Doc. 38-1 at 79; Aple APP111, R. Doc. 38-1 at 86; Aple APP124-125, R. Doc. 38-1 at 116-117; Aple APP131, R. Doc. 38-1 at 9; Aple APP138, R. Doc. 38-2 at 13; Aple APP142-143, R. Doc. 38-2 at 19-20. Instead, Nelson alleges that Madsen had "an improper relationship with a female employee" that amounted to "sexual harassment." Aple APP196, R. Doc. 38-3 at 9, ¶ 24.) Nelson bases her "factual" assertions on

conversations with another employee, Molly O'Malley, and her speculation about conversations she admittedly was not a part of. O'Malley was not deposed and Nelson cannot inject fact issues into the record by relying on hearsay and speculation.

In her deposition, Nelson was asked to provide the basis of her sex discrimination claim against LEB. Aple APP037, R. Doc. 38-1 at 22. In response, Nelson launched into a story about Madsen filled with speculation, including rumors about the parentage of a fellow employee's child, Aple APP038-039, R. Doc. 38-1 at 23-24, gossip from Nelson's supposed conversations with friends and co-workers Aple APP045, R. Doc. 38-1 at 30; Aple APP039, R. Doc. 38-1 at 24, and assumptions based on Nelson's own alleged review of legal documents Aple APP046, R. Doc. 38-1 at 31. Nelson claims that this supposed "harassment" occurred in 2014-2015, at least three years prior to Nelson's termination. Aple APP038, R. Doc. 38-1 at 23. Moreover, Nelson admitted on multiple occasions she did not have personal, firsthand knowledge, of these allegations. Indeed, Nelson testified as follows:

- Though Nelson stated Madsen worked in investments, she did not know his exact title. Aple APP037-038, R. Doc. 38-1 at 22-23.

- That the female employee involved in this alleged situation was a teller who reported directly to Nelson, not to Madsen. *Id.*

- Nelson admitted she did not have personal knowledge about this alleged situation, stating as a precursor to her story: "I guess I can't attest to a lot of

it." Aple APP038, R. Doc. 38-1 at 23. Later on, when asked if she actually knew what happened with this supposed situation, Plaintiff stated: "Well, again, I don't know all the details." *Id.*

- Alleging that Madsen and the female employee had a "relationship" and that, indeed, it could have been consensual. *Id.*; Aple APP115-116, R. Doc. 461- at 63, R. Doc. 38-1 at 109.

- Throughout her testimony, Nelson offered no details about any specific behavior, comment, or conduct that supposedly amounted to "harassment". *Id.,* Aple *APP*027, R. Doc. 38-1 at 13; Aple APP036, R. Doc. 46-1 at 49; Aple APP047-049, R. Doc. 46-1 at 50-51, and R. Doc. 38-1 at 32.

- That she had never spoken with this teller about her supposed relationship with Madsen. Aple APP043, R. Doc. 38-1 at 28.

- That she had never personally seen any type of harassment claim in writing made by the teller against Madsen. Aple APP041-042, R. Doc. 38-1 at 26-27.

- Nelson claims to have seen a letter the teller wrote to Madsen on one occasion but stated: "I didn't read it" *Id.* and then again admitted she had not ever seen the contents of the letter. Aple APP042, R. Doc. 38-1 at 27.

Additionally, Nelson never worked in Human Resources while at LEB and at all times worked in teller department. Aple APP004, R. Doc. 38-1 at 5; Aple APP019-021, R. Doc. 38-1 at 6-7. Thus, she did not have access to confidential Human Resources documents.

On the contrary, employees with requisite knowledge of employee complaints and access to confidential Human Resources matters testified that they are not aware of any sexual harassment complaint made against Madsen. Indeed, when asked about other instances of sexual harassment complaints, Billingsley, who has been employed at the Bank since 1996, testified as follows:

> Q: Are you aware of any complaints of sexual harassment by women against men at the bank say within the last ten years?
>
> A: No, there are none, none that I'm aware of.

Aple APP111, R. Doc. 38-1 at 86. Moreover, as to Madsen, specifically, Billingsley testified:

> Q: Did you ever receive any complaints about Mr. Madsen sexually harassing female employees?
>
> A: I don't recall receiving any complaints.

Aple APP103, R. Doc. 38-1 at 79. Plante, who has been employed at the Bank for approximately 27 years, also testified:

> Q: Are you aware of any complaints of sexual harassment or discrimination by female employees towards Steve Madsen?
>
> A: I'm not.

Aple APP124-125, R. Doc. 38-1 at 116-117. Raleigh, President and CEO of the Bank, who has held this position since 2006, testified:

> Q: Were you ever aware of any complaints by female employees about Mr. Madsen sexually harassing them?
>
> A: No.
>
> ***
>
> Q: Are you aware of any complaints of sexual harassment made by employees of Lake Elmo Bank other than the one made by Olivia Alvarado against Heidi Martin in this case?
>
> A: Not that I recall.

Aple APP131, R. Doc. 38-2 at 9; Aple APP138, R. Doc. 38-2 at 13.

Moreover, Plaintiff deposed Madsen on September 13, 2021. Madsen testified that he had a consensual, romantic relationship with another bank employee. Aple APP140-141, R. Doc. 38-2 at 16-17. That employee did not report to him. The relationship ended. Aple APP141, R. Doc. 38-2 at 17. After that, Madsen testified that he had some general interaction with her at work, but nothing further. Aple APP142, R. Doc. 38-2 at 19. Madsen testified that this employee did not tell him to stop talking to her, to leave her alone, or ever make a complaint about their prior relationship *Id.* Madsen further testified that a formal complaint of a sexual harassment was never made against him and that he was never contacted by Human Resources. Aple APP142-143, R. Doc. 38-2 at 19-20. Indeed, Madsen testified that the only bank employee that he discussed this relationship with was Nelson, because they were friends outside of work at the time. Aple APP143, R. Doc. 38-2 at 20.

### 2. Barney Patterson

Barney Patterson worked in LEB's IT department. Aple APP099, R. Doc. 38-1 at 75. His supervisor was Ryan Jannes. *Id.* Patterson never reported Nelson and Nelson never reported to Patterson, because they worked in different departments. Ana Martin is a teller at LEB. Aple APP049, R. Doc. 38-1 at 32. She previously reported to Nelson. (*Id.*)

Despite Nelson's allegations related to Patterson, Nelson admitted that while she observed Patterson speaking to Martin, she could "not hear the conversation"

24

and therefore has no personal knowledge as to whether anything Patterson said was inappropriate. *Id.* While Nelson claims to have advised Martin to make some type of report to Human Resources, Nelson does not allege that she has personal knowledge of any actual complaint made to Human Resources. *Id.*

As noted above, neither Billingsley nor Raleigh has any knowledge, record, or information about <u>any</u> complaints of sexual harassment against male employees at the Bank. Moreover, as to Patterson specifically, Billingsley testified as follows:

> Q:  Are you aware of complaints about Barney Patterson, about comments he made to females at the Lake Elmo Bank regarding the computer flashing inactive?
>
> A:  No, I don't know what you're referring to.
>
> Q:  Have you had complaints by women about the bank about sexually offensive comments made by Barney Patterson?
>
> A:  Not that I remember.
>
> Q:  Are you aware of a complaint about Mr. Patterson making a remark about a flashing inactive computer light and stating that it sounded like a sex problem?
>
> A:  No, I'm not aware of that.
>
> Q:  Are you aware of reports of sexual harassment of Barney Patterson by Ana Martin at the bank?
>
> A:  No.

Aple APP099-100, R. Doc. 38-1 at 75-76. Raleigh was also not aware of any complaints made against Patterson:

Q: Did you ever become aware of complaints about comments [Mr. Patterson] had made to female employees that were sexually offensive.

A: I have not.

\*\*\*

Q: Did you ever become aware of a complaint by Ana Martin about Barney Patterson sexually harassing her?

A: No.

Aple APP130, R. Doc. 38-2 at 8; Aple APP132, R. Doc. 38-2 at 10.

It is undisputed that Nelson never complained to anyone at LEB about Patterson's alleged conduct. Aple APP046-049, R. Doc. 38-1 at 31-32, R. Doc. 46-1 at 50-52. Rather, Nelson alleges she advised others to make complaints, yet she has no personal knowledge as to whether any complaints were actually made. (*Id.*). Indeed, none were. Aple APP099-100, R. Doc. 38-1 at 75-76; Aple APP130, R. Doc. 38-2 at 8; Aple APP132, R. Doc. 38-2 at 10.

## SUMMARY OF THE ARGUMENT

Nelson failed to meet her burden on summary judgment to show that Lake Elmo Bank discriminated against her because of her sex. Nelson also failed to meet her burden on summary judgment to establish defamation claims against Lake Elmo Bank and Alvarado because each of the alleged defamatory statements were entitled to a qualified privilege.

First, Nelson failed to come forward with evidence that showed that Lake Elmo Bank's reason for her termination was pretext for discrimination. On appeal,

26

Nelson has identified five categories of evidence that allegedly demonstrate pretext. The district correct determined that, as to each of these five categories, Nelson could not show pretext, because: (1) the Bank's investigation into Alvarado's sexual harassment complaint was not faulty; (2) any differences or inconsistencies in Alvarado's statements were innocuous; (3) the Bank followed its own internal policies; (4) Nelson failed to identify any valid comparator who was treated more favorably; and (5) the Bank's reason for terminating Nelson's employment was that it determined Alvarado's claim of sexual harassment was credible and that Nelson had violated the Bank's sexual harassment policy. Summary judgment on Nelson's claim of sex discrimination was therefore appropriate.

Second, Nelson's defamation claims against Lake Elmo Bank and Alvarado fail because each of the alleged defamatory statements were subject to a qualified privilege. The district court correctly determined that all statements made during the course of the Bank's internal investigation, by Alvarado and other Bank employees, were made upon a proper occasion and for a proper purpose and were thus entitled to a qualified privilege. The district court further held that Nelson failed to show that either Alvarado or any other employee of the Bank acted with actual malice. Moreover, Alvarado's statements that she made to her parents and live-in boyfriend are likewise protected by a qualified privilege, because the statements concerned her private interests and were made in the conduct of her private affairs. As such,

summary judgment on Nelson's defamation claims was proper.

**STANDARD OF REVIEW**

The Court reviews a district court order granting summary judgment *de novo.* *Ramlet v. E.F. Johnson Co.,* 507 F.3d 1149, 1153 (8th Cir. 2007). Summary judgment is appropriate where there are no disputed issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

When opposing summary judgment, the nonmoving party cannot create a genuine dispute of fact by relying upon conclusory allegations, speculation or general assertions, but must produce sufficient probative evidence in the record demonstrating a genuine issue for trial. *See Anderson,* 477 U.S. at 256; *Davenport v. Univ. of Ark. Bd. of Trs.,* 553 F.3d 1110, 1113 (8th Cir. 2009); *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). "The mere existence of a scintilla of

Appellate Case: 22-2827    Page: 36    Date Filed: 11/28/2022 Entry ID: 5221603

evidence in support of the Plaintiff's position will be insufficient;" rather, "there must be evidence on which the jury could reasonably find for the Plaintiff." *Anderson,* 477 U.S. at 252.

Appellate Case: 22-2827     Page: 37     Date Filed: 11/28/2022 Entry ID: 5221603

**ARGUMENT**

I. **NELSON FAILED TO MEET HER BURDEN OF DEMONSTRATING TRIABLE FACT ISSUES REGARDING WHETHER LAKE ELMO BANK'S REASON FOR TERMINATING HER EMPLOYMENT WAS PRETEXTUAL**

The Minnesota Human Rights Act ("MHRA") prohibits employment discrimination based on sex. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993); *Rasmussen v. Two Harbors Fish Co.,* 832 N.W.2d 790, 795 (Minn. 2013). When evaluating MHRA claims of discrimination, courts apply the three-part burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 311 U.S. 792 (1973); *Hansen v. Robert Half Int'l, Inc.,* 813 N.W.2d 906, 918 (Minn. 2012). Under the *McDonnell Douglas* standard, the plaintiff must first demonstrate a prima facie case by a preponderance of the evidence. *Ray v. Miller Meester Adver., Inc.,* 664 N.W.2d 355, 367 (Minn. Ct. App. 2003) *aff'd,* 684 N.W.2d 404 (Minn. 2004). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. *Id.* Finally, if the defendant meets its burden, the plaintiff must then prove that the legitimate reason offered by the defendant was merely pretextual. *Id.* The burden of persuasion remains with the plaintiff at all stages. *Goins v. W. Grp.,* 635 N.W.2d 717, 724 (Minn. 2001).

**A. Nelson Failed to Establish a Prima Facie Case**

To present a prima facie case of sex discrimination, Nelson needs to show:

30

(1) she belongs to a protected class; (2) she was qualified for this position; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Elnashar v. Speedway SuperAmerica, LLC,* 484 F.3d 1046, 1055 (8th Cir. 2007).

As an initial matter, when moving for summary judgment, LEB argued that Nelson failed to establish a prima facie case of discrimination because she had not satisfied the fourth required element by showing that the circumstances surrounding her termination permit an inference of unlawful sex discrimination. Though the district court granted LEB's motion for summary judgment on Nelson's sex discrimination claim on alternative grounds, LEB does not waive this argument on appeal.

Nelson was terminated for engaging in sexual harassment of her subordinate Alvarado, who is also female. Plante, Nelson's direct supervisor who initially spoke with Alvarado, is female. Both Billingsley and Roettger who conducted the subsequent investigation and made the decision to terminate Nelson are female.

It is true that the MHRA does not specify that the gender of the victim and the alleged discriminators must be different. Nevertheless, the fact that all of the individuals involved in the disputed incident were female, undermines Nelson contention that she was treated unfairly because of her sex. Though Nelson appears to contend that she was treated unfairly during the course of the investigation as

31

compared to Alvarado, Alvarado belongs to the same protected class, as do all of the decision makers. Moreover, there is not a single piece of record evidence of any biased comments or conduct by any decision maker.

The district court focused its analysis on the issue of pretext and offered no analysis as to why or how Nelson met her burden of establishing the fourth required element of her sex discrimination claim. LEB and Alvarado maintain that Nelson's claim independently fails for failure to establish a prima facie case. While Appellees focus the majority of their analysis on the issue of pretext, as addressed in the subsections below, Appellees do not waive their argument that Nelson also failed to establish a prima facie case.

### B. Nelson Failed to Establish Pretext

Even if Nelson had established a prima facie case of gender discrimination, LEB can rebut the inference of unlawful discrimination by offering a legitimate, non-discriminatory reason for its decision to terminate her employment. *See Anderson*, 88 F. Supp. at 984. This "burden is one of production, not persuasion; it can involve no credibility assessment." *Bennis*, 2013 WL 3305213, at *13 (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000)) (internal quotations omitted). "A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination." *Twymon v. Wells Fargo & Co*., 462

32

F.3d 925, 935 (8th Cir. 2006).

Nelson was terminated as the result of LEB's investigation into a complaint of sexual harassment made by an employee that Nelson supervised. LEB's investigation revealed that the claim of sexual harassment was credible and that Nelson had violated LEB's sexual harassment policy. As a result of Nelson's actions, in violation of company policies, Nelson was terminated. Violation of a sexual harassment policy can be a legitimate non-discriminatory basis for termination. *See Fry v. Parcelite Sols.*, 502 F. App'x 631, 632 (8th Cir. 2013) (finding employer offered legitimate nondiscriminatory reason for employee's discharge: after conducting an internal investigation based on an internal complaint, employer determined the employee had violated its policy prohibiting sexual harassment); *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004) (employer offered legitimate, nondiscriminatory basis for terminating employee: that employee violated the sexual harassment policy when she physically grabbed male co-worker's genitalia).

Even if Alvarado's allegations were false—which both LEB and Alvardo strongly deny—LEB terminated Nelson based on a good faith belief that Nelson had engaged in sexual harassment. Indeed, LEB relied on the advice of counsel in making its decision to terminate Nelson's employment. If an employer honestly (but mistakenly) believes that an employee is terminated for misconduct, the employer

33

cannot be liable for discrimination. *Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008) (citing *Stuart v. Gen. Motors Corp.,* 217 F.3d 621, 637 (8th Cir. 2000)). "If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity." *Richey*, 540 F.3d at 784. Thus, even if LEB's conclusion was mistaken, Nelson's termination would not amount to sex discrimination.

As such, the burden shifts back to Nelson to prove that Lake Elmo Bank's reason is pretext. *See Anderson*, 88 F. Supp. 3d at 984 (D. Minn. 2015). Nelson has the burden of persuasion at all times. *Bone v. G4S Youth Servs.*, LLC, 686 F.3d 948, 955 (8th Cir. 2012). "[T]he showing of pretext ... requires more than merely discrediting an employer's asserted reasoning for terminating an employee. A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." *Anderson*, 88 F. Supp. 3d at 984 (quoting *Haigh v. Gelita USA, Inc.* 632 F.3d 464, 470 (8th Cir. 2011)). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Bone*, 686 F.3d at 955 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993)). Showing pretext requires more substantial evidence than the evidence required to make a prima facie case because evidence of pretext is viewed in light of the employer's justification. *Sprenger v.*

*Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001).

Nelson's subjective belief regarding her termination is also irrelevant at the pretext stage. *See Anderson v. Fairview Health Servs., Inc.,* No. A07-1481, 2008 WL 3289269, at *6 (Minn. Ct. App. Aug. 12, 2008) (a plaintiff's subjective belief that she was being discriminated against cannot raise a genuine issue of material fact regarding a discriminatory motive); *see also Vincent v. Roundy's, Inc.,* No. 05-2995, 2007 WL 2226029, at *5 (D. Minn. July 31, 2007). Moreover, courts are not to second-guess employer's decisions even where those decisions are ineffective, unless the decisions are discriminatory. *Haigh v. Gelita USA, Inc.,* 632 F.3d 464, 470 (8th Cir. 2011).

Nelson has made nothing but conclusory allegations to support an inference of sex discrimination. She has offered no evidence that LEB's stated reason for terminating her employment is false. Instead, Nelson attempts to rely on five methods in order to establish pretext. As addressed in turn below, and based on the undisputed record, each of these methods is insufficient to establish pretext.

### 1. The Bank's investigation was thorough and prompt

Nelson contends that LEB conducted an inadequate investigation into Alvarado's claims because it chose not to interview non-employees who were supposedly present at the Harbor Bar. Yet, there is no legal requirement to do so. Indeed, Nelson has failed to identify any law or internal policy that the Bank failed

Appellate Case: 22-2827     Page: 43     Date Filed: 11/28/2022 Entry ID: 5221603

to follow in conducting its investigation.

Billingsley testified that it is LEB's practice to keep employee matters confidential and that certainly LEB did not want to provide grounds for a claim of defamation. Aple APP110, R. Doc. 38-1 at 85. Such a practice is certainly reasonable. Indeed, in this very same case, Nelson also claims that LEB defamed her.

Notably, Nelson's claims are contradictory: on the one hand she takes issue with LEB's practice of keeping employee matters confidential and not involving non-employees in investigations while on the other hand she claims LEB impermissibly defamed her by telling others about Alvarado's allegations. In short, Nelson argues LEB talked to too many people and not enough people at the same time. Regardless, it is undisputed that LEB interviewed the employees involved, relied on the relevant policies in its employee handbook, and consulted with legal counsel during its investigation.

Employees' subjective belief about the inadequacy of an investigation does not undermine an employer's ultimate conclusion if made in good faith. For example, in *Johnson v. AT&T Corp.*, plaintiff claimed that his termination was the result of race and age discrimination. 422 F.3d 756 (8th Cir. 2005). AT&T argued that it believed plaintiff had violated its code of conduct by making threats to bomb its facility. *Id.* at 762. Plaintiff argued that AT&T was mistaken and that it had not

conducted a sufficient investigation for its belief to be considered "reasonable." *Id.* The Eighth Circuit disagreed, stating:

> The proper inquiry *is not* whether AT&T was factually correct in determining that Johnson had made the bomb threats. Rather, the proper inquiry is whether AT & T honestly believed that Johnson had made the bomb threats. Thus even if AT & T had no solid proof that Johnson made the bomb threats, and even if AT & T was mistaken in its belief that Michael Johnson had made the threats, any such mistake does not automatically prove that AT & T was instead motivated by unlawful discrimination.

*Id.* (emphasis in original) (citations omitted).

As such, in this case, Nelson's subjective belief that LEB's investigation was faulty is immaterial. The relevant inquiry is whether LEB honestly believed, even if mistakenly, Alvarado's allegations. It is undisputed that LEB's witnesses confirmed this good faith belief. Aple APP110, R. Doc. 38-1 at 85; Aple APP084-085, R. Doc. 38-1 at 95-96. Nelson has presented no contrary evidence that is sufficient to raise a genuine question of material fact on this issue.

Moreover, Nelson has failed to point to anything in the record demonstrating that the Bank was acting out of a discriminatory animus. As such, this supposed method of establishing pretext must fail.

### 2. Alvarado's alleged "inconsistencies" are innocuous

Relatedly, Nelson argues that Alvarado's version of events was inconsistent and contends that the Bank's proffered reason for terminating Nelson's employment can therefore be questioned. In so arguing, Nelson points to innocuous statements in

37

Alvarado's accounts of the events related to how Nelson inappropriately touched her, whether she was actually a psychologist, and an aside comment about Nelson acting inappropriately at bars towards employees on other occasions. Record evidence is clear, however, that Alvarado consistently reported that Nelson acted inappropriately towards her at the Harbor Bar and engaged in conduct that she believed constituted sexual harassment. Nelson provides no reason as to why the alleged small differences would cause the Bank to call into question the veracity of Alvarado's allegations.

Moreover, Nelson further confused the issue by pointing to alleged inconsistencies in Alvarado's original report of harassment in September 2018 and her account of the same events given at her deposition nearly three years later in May 2021. While LEB and Alvarado deny there are any inconsistencies, this is also irrelevant to the issue of pretext. For example, Alvarado mentioned seeing a psychologist in a text message in 2018. During her deposition in 2021, however, Alvarado admitted that she had no psychologist. Yet this fact has no bearing on whether the Bank had a reason to discredit Alvarado's version of events back in 2018. Nelson has offered no evidence that the Bank did not honestly believe Alvarado's version of events based on its investigation. As such, this method of establishing pretext must also fail.

### 3. *The Bank followed its internal policies*

Appellate Case: 22-2827    Page: 46    Date Filed: 11/28/2022 Entry ID: 5221603

Nelson also claims that pretext can be established because LEB failed to follow its own policies in conducting its investigation into Alvarado's allegations. Not so. Indeed, Nelson has not pointed to a single rule or procedure that the Bank allegedly failed to follow.

Instead, Nelson argues that it was a policy violation for Roettger to shred her handwritten interview notes after Roettger had used the notes to type of summaries of her interviews for the investigation file. While Nelson may subjectively believe that this "should" be a policy, she points to no record evidence to demonstrate that this was indeed a Bank policy that was violated. There is nothing in the Employee Handbook, or any other written policy, that prohibits the shredding of handwritten notes after a typed summary has been created. There is also no indication that in a similar type of investigation, handwritten notes were preserved while they were not in this case. In short, there is no record evidence whatsoever that the Bank failed to follow any actual policy. In fact, Raleigh, LEB's president, testified that shredding handwritten notes after they were transcribed was expected "so they're not lost or get thrown in a wastebasket of get in the wrong hands." Aple APP137, R. Doc. 46-1 at 74.

Nelson also takes issue with the accuracy of the typed notes. Specifically, Nelson points to the typed version of Alvarado's interview which mentions the "lobby of the bar" rather than the lobby of the bank. While certainly a mere typo,

Nelson argues that such an innocuous inaccuracy is the makings of pretext. She cites to no authority for such assertion.

Nelson further alleges that there is no evidence that the written summaries complied with LEB's policies. In so arguing, Nelson attempts to improperly shift the burden of proof to LEB. That is not the standard. To prove pretext based on a failure to follow a policy, Nelson has the burden of demonstrating an actual policy violation. She has failed to do so. As such, this method also fails.

### 4. *Nelson failed to identify a proper comparator*

To show discrimination based on the treatment of similarly situated employees, Nelson must identify employees who were similar to her in all respects, outside of her protected class, but treated more favorably. *See Bone v. G4S Youth Servs.*, LLC, 686 F.3d 948, 956 (8th Cir. 2012); *Goncalves v. Plymouth Cty. Sheriff's Dep't*, 659 F.3d 101, 106 (1st Cir. 2011). Nelson cannot meet this burden because LEB has not received any other complaints or reports of sexual harassment against any other employee, male or female. This undisputed fact alone undermines Nelson's attempt to rely on this type of evidence to establish her claim, because Nelson has no suitable comparator as a matter of law.

Indeed, comparator evidence may be used to prove pretext, but the test for determining whether an employee is similarly situated to a plaintiff is "a rigorous one." *Bone*, 686 F.3d at 955. Nelson must show that she and the employees outside

40

of her protected group who were supposedly treated more favorably were similarly situated in <u>all</u> relevant respects. *Id.* at 956. The employees must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Antonich v. U.S. Bank Nat'l Ass'n*, No. 14-CV-710 SRN/HB, 2015 WL 4771551, at *16 (D. Minn. Aug. 13, 2015). Nelson has the burden to demonstrate that there were employees outside her protected class who were not disciplined as she was for comparable conduct. *See Doucette v. Morrison Cty.*, 763 F.3d 978, 983 (8th Cir. 2014)

Nelson points to two male employees that she alleges are "comparators." The record is clear, however, that Nelson and these two male employers are not comparators as a matter of law.

First, Nelson points to Steve Madsen. As noted above, Madsen is the head of the Investment Department at LEB, he has been with the Bank for decades, and he reports directly to Raleigh. According to all admissible record evidence, there has never been a complaint of sexual harassment brought against Madsen during his time working at LEB. This was confirmed by the undisputed testimony of Billingsly, Plante, Raleigh, and Madsen himself. Aple APP111, R. Doc. 38-1 at 86; Aple APP103, R. Doc. 38-1 at 79; Aple APP124-125, R. Doc. 38-1 at 116-117; Aple APP131, R. Doc. 38-2 at 9, Aple APP138, R. Doc. 38-2 at 13; Aple APP142-143, R. Doc. 38-2 at 19-20. Moreover, though Nelson testified based on hearsay and

41

rumor that she "believed" a report of sexual harassment had been made against Madsen, she admitted she had no first-hand personal knowledge to support her subjective belief. Aple APP038, R. Doc. 38-1 at 23; Aple APP041-043, R. Doc. 38-1 at 26-28.

In short, the record evidence demonstrates that Madsen was not similarly situated to Nelson in any relevant manner. Madsen worked in a different department, had a different title, reported to a different supervisor, and performed different job duties then Nelson. Moreover, there is no evidence he engaged in similar conduct to Nelson. Indeed, no one even ever made a complaint that Madsen engaged in sexually harassing behavior. Nelson also had a documented pattern of engaging in inappropriate behavior as evidenced by her prior written disciplinary notices and performance reviews. There is nothing in the record demonstrating that Madsen had a similar disciplinary history. As a matter of law, Madsen is not a comparator to Nelson.

Second, Nelson points to Barney Patterson. As discussed above, Patterson worked in the IT department and reported to Ryan Jannes. There is no record evidence that a claim of harassment was ever made against Patterson. Again, Nelson testified based on hearsay alone that she "believed" Martin had made a complaint against Patterson. Yet, Nelson admitted that while she advised Martin to make a report, she had no personal first-hand knowledge that such a report was actually

42

made. Aple APP049, R. Doc. 38-1 at 32. Other witnesses confirmed that no such complaint existed. Both Billingsley and Raleigh confirmed in their depositions that no complaints had been made against Patterson by Ana Martin, or any other employee. Aple APP99-100, R. Doc. 38-1 at 75-76; Aple APP130, R. Doc. 38-2 at 8; Aple APP132, R. Doc. 38-2 at 10.

As such, Patterson is also not a proper comparator to Nelson because he worked in a different department, had a different title, performed different job responsibilities, and reported to a different supervisor. Moreover, there is no admissible evidence that Patterson engaged in similar conduct to Nelson or was even ever accused of engaging in similar conduct.

As a last-ditch effort to establish pretext related to Madsen and Patterson, Nelson argues that "the dearth of complaints of sexual harassment" is because the bank did not investigate them. She claims "Madsen and Patterson are examples," yet offers no rational or record citation for this assertion. Basically, Nelson is attempting to argue that the "lack" of any formal complaint against Madsen and Patterson is somehow evidence that they were treated differently. This Court should reject Nelson's invitation to find that a lack of evidence somehow demonstrates that these individuals did indeed engage in sexual harassment. Nelson cites to no authority as to why such a conclusion should be made when it contradicts all record evidence.

Other than being employed by LEB, Madsen and Patterson are not similarly

situated to Nelson in any relevant way. As such, Nelson's reliance of supposed comparator evidence fails as a matter of law.

5. ***The Bank's reason for terminating Nelson's employment***

LEB's reason for terminating Nelson's employment has remained consistent since October 2018. LEB determined pursuant to its investigation into allegations of sexual harassment made by Alvarado that Nelson engaged in misconduct. Each witness deposed in this case testified to this fact. Indeed, Nelson's entire MHRA claim is premised on her allegation that she was wrongfully terminated as a result of Alvarado's allegations.

Nelson's claim that LEB has shifting reasons for her termination is entirely unsupported by the record evidence. LEB has always maintained that it reviewed item's from Nelson's personnel file during its investigation into Alvarado's complaint of sexual harassment. No witness testified that this review, however, had any material role in the decision to terminate Nelson's employment. Indeed, Nelson cites to deposition testimony in support of her theory that Alvarado's peer review, or any other document, was the reason for her termination. Instead, Roettger merely testified that this document, along with others, were collected during the investigation process. As such, there is no evidence to support Nelson's argument that LEB shifted its reason for terminating her employment.

Because Nelson failed to establish the existence of pretext through any of the

44

five methods she relies upon, the district court properly granted summary judgment on Nelson's sex discrimination claim.

## II. NELSON FAILED TO ESTABLISH THE EXISTENCE OF A DEFAMATORY STATEMENT BECAUSE A QUALIFIED PRIVILEGE PROTECTS EACH OF THE STATEMENTS AT ISSUE

To prevail in a defamation action, the plaintiff must show "that the defendant made: (a) a false and defamatory statement about the plaintiff; (b) in an unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003). All of the statements Nelson alleges are defamatory are entitled to a qualified privilege and therefore Nelson's claims fail as a matter of law.

### A. Nelson's Defamation Claim Against the Bank Fails Because She is Unable to Establish Publication

In moving for summary judgment, LEB argued that the Nelson's defamation claim against the bank failed because Nelson could demonstrate that LEB published the statements to a third party. Though the district court found in favor of LEB on alternative grounds as discussed below, LEB does not waive this argument on appeal.

On appeal, Nelson appears to limit her claim of defamation against LEB to only a handful of alleged statements. In her deposition testimony and at the district court, however, Nelson attempted to argue that various emails and supposed statements made to other employees at the bank were defamatory. Nelson has not

45

raised these same specious arguments on appeal and has thus waived any such argument. Instead, in regard to the claim against the Bank, Nelson focuses only on the statements made by Alvarado, as an employee of the bank, and by other management level employees of the bank during the course of the investigation into Alvarado's complaint.

There is no evidence, however, that any of these statements made during the course of the internal investigation were ever published to a third party. Rather, the evidence demonstrates that Alvarado made her complaint to management-level personnel, and that these allegations were repeated to Nelson in a closed-door meeting as part of the ongoing investigation. All record evidence demonstrates that the investigation was confidential. There is no evidence in the record that any employee of LEB ever discussed the circumstances leading to Nelson's termination or Alvarado's allegations with a third party. As such, Nelson's defamation claim against LEB fails on this basis alone.

### B. Qualified Privilege protects statements made during an employment investigation

Qualified privileges attach to a broad range of circumstances where the interest in shielding the defendant from defamation liability is considered worthy of protection. *Moreno v. Crookston Times Printing Co*., 610 N.W.2d 321, 328 (Minn. 2000). One who makes a defamatory statement is not liable if the statement was communicated under circumstances that make it qualifiedly privileged, as long as

46

that privileged is not abused. *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997) (citations omitted). A defamatory statement is covered by qualified privilege if made in good faith and "upon a proper occasion, from a proper motive, and ... based upon reasonable or probable cause." *Stuempge*s, 297 N.W.2d at 256–57 (quoting *Hebner v. Great N. Ry. Co*., 78 Minn. 289, 80 N.W. 1128, 1129 (1899)).

In the employment context, the Minnesota Supreme Court has stated that: "Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose." *McBride*, 306 Minn. at 97, 235 N.W.2d at 374. "[C]ommunication to employees about the reasons for another employee's discharge are also qualifiedly privileged." *Ewald v. Wal–Mart Stores, Inc*., 139 F.3d 619, 623 (8th Cir.1998); *see also Lewis v. Eq. Life Assur. Soc. of the U.S*., 389 N.W.2d 876, 890 (Minn. 1986) (recognizing qualified privilege applies to statements regarding employees discharge, because of public interest that reasons be available to both discharged employee and prospective employers).To extent Nelson's defamation claims rely on statements made by Alvarado or other bank employees during the course of the internal investigation, Nelson's claim must fail because these statements are entitled to a qualified privilege.

In *Jones v. Keith,* the court found that because Keith reported harassing behavior pursuant to an employer's sexual harassment policy, "Keith's statements

Appellate Case: 22-2827     Page: 55     Date Filed: 11/28/2022 Entry ID: 5221603

were protected by a qualified privilege." CIV. 00-2741 ADMSRN, 2002 WL 273141, at *3 (D. Minn. Feb. 25, 2002). *see also Lee v. Metro. Airport Commn.,* 428 N.W.2d 815 (Minn. App. 1988) (finding that co-employees' comments about another employee's harassing behavior were subject to a qualified privilege). The court stated: "[e]mployees should not be intimidated from reporting sexual harassment by the specter of a defamation lawsuit. Communications involving investigations into employee misconduct have long been shielded by the qualified privilege." *Id.* This determination is in furtherance of the public policy of eliminating sexual harassment from the workplace. *Id.* ("Defamation litigation must not be allowed to undermine the public policy of eliminating sexual harassment from the workplace.").

The only people who participated in LEB's investigation were Alvarado, Nelson, Billingsley and Roettger as members of LEB's human resources department, and Raleigh, LEB's president. LEB was conducting its investigation in accordance with its policies and in response to a formal complaint made by an employee. Alvarado made her complaint in accordance with LEB's policies. As such, any statement made during the course of the investigation by Alvarado or any of LEB's other employees were made "upon a proper occasion and for a proper purpose." As such, to the extent Nelson's defamation claims rely on any such statements, her claim fails as a matter of law.

## C. There is no evidence of actual malice as to the statements made during the employment investigation

Nelson argues that LEB and Alvarado "abused" their privilege and therefore are not entitled to its protection. To overcome the application of a qualified privilege, Nelson must prove that LEB and Alvarado acted with "actual malice." *Stuempges v. Parke, Davis & Co*., 297 N.W.2d 252, 257 (Minn. 1980). Nelson has the burden of proving actual malice, which is defined as "actual ill will, or a design causelessly and wantonly to injure plaintiff." *McBride v. Sears, Roebuck & Co*., 235 N.W.2d 371, 375 (1975). Nelson's argument fails as there is no genuine issue of material fact.

Although "[t]he issue of whether actual malice is present is usually a jury question," Minnesota's appellate courts have repeatedly held "that a defamation claim that raises a malice issue may properly be subject to summary judgment." *Wallin*, 598 N.W.2d at 402-03 (affirming the plaintiff failed to establish a material fact issue as to malice and discussing *Michaelson v. Minnesota Min. & Mfg. Co*., 474 N.W.2d 174, 182 (Minn. App. 1991) ("[T]he record does not establish" that the statements were made "with the requisite actual malice to create a cause of action," and affirming the grant of summary judgment) *affd*, 479 N.W.2d 58 (Minn. 1992)); *Hunt v. Univ. of Minn*., 465 N.W.2d 88, 93 (Minn. 1991) (holding several isolated incidents along with speculation that the defendant disliked the plaintiff "hardly constitute the evidence necessary to submit the question of malice to a jury" and

49

affirming grant of summary judgment to the defendant); *Sherman v. Rinchem Co.*, 687 F.3d 996, 1010 (8th Cir. 2012) (affirming grant of summary judgment when there was insufficient evidence for finding actual malice to send the issue to a jury).

As to LEB, Nelson claims actual malice can be proved because LEB failed to adequately investigate Alvarado's allegations. In so arguing, Nelson's reliance on *Williamson* is misplaced. *Scott Fetzer Co. v. Williamson*, 101 F.3d 549, 555 (8th Cir. 1996). There, the court stated: "When a party making a defamatory statement takes <u>no steps to investigate</u> but <u>relies entirely on hearsay</u> without verification, he has not acted as a reasonably prudent person and lacks probable or reasonable grounds for making a defamatory statement." *Id.* Here, LEB did take steps to investigate, including interviewing the employees involved in the alleged incident. Alvarado's version of events, based on her own personal knowledge, is not hearsay. Nelson has not demonstrated the investigation was clearly unreasonably. Nelson offers no credible evidence as to how LEB abused its privilege.

As to Alvarado, Nelson claims that Alvarado abused her privilege by using "exaggerated and spiteful comments." Nelson's proffered evidence is the July 2018 Peer Review. Nelson cites to no authority however, that such evidence—a document authored *three months prior*—can be used to establish malice as to the statements at issue. In *Bahr,* the case Nelson relies upon, the time frame between comments showing actual malice and the alleged defamation was a mere two weeks. *Bahr v.*

Appellate Case: 22-2827     Page: 58     Date Filed: 11/28/2022 Entry ID: 5221603

*Boise Cascade Corp*., 766 N.W.2d 910, 921 (Minn. 2009). *Bahr* is further distinguishable because there, defendant referred to plaintiff as a "lazy, fat f***er" in front of two other employees. *Id.* 920. Alvarado made no statement arising to this level. Rather, the peer review was confidentially submitted to HR upon request and, therefore, also entitled to a qualified privilege. Nelson has cited to no authority which supports the conclusion that one statement that is qualifiedly privileged can establish "actual malice" for another statement that is qualifiedly privileged.

Moreover, as noted by the district court, Alvarado explicitly stated in the review that she did not wish for Nelson to be "terminated" due to the review. The peer review was also focused on Nelson's professional value as a Bank employee and does not mention any of Alvarado's personal feeling towards Nelson. A professional critique of work is insufficient to establish actual malice.

As to LEB, Nelson argued that the Bank acted with actual malice as demonstrated by Roettger's inclusion of Alvarado's "exaggerated language, rumors, and false statements." Again, Nelson contradicts herself. In arguing for a finding of pretext in relation to her sex discrimination claim, Nelson complains that Roettger's summaries did not transcribe the witness interviews verbatim. Yet, in relation to her defamation claim, Nelson now argues that Roettger's exact repetition of Alvarado's allegations is evidence of actual malice. Nelson can't have it both ways. As the district court held, actual malice cannot be found from HR personnel recording what

51

an employee reporting during the course of an interview.

Therefore, there is no genuine issue of fact as to whether LEB or Alvarado abused their qualified privilege and summary judgment is appropriate.

### D. Nelson's defamation claim against Alvarado based on statement she made to family members also fails

Nelson also bases her claim of defamation against Alvarado on statements Alvarado made to her parents and long-term partner. These statements are also entitled to a qualified privilege and therefore Nelson's claim fails.

As stated above, a qualified privilege exists when a communication is made "upon a propose occasion from a proper motive." *Stuempges*, 297 N.W.2d at 256–57. The doctrine of privileged communications is based on vital public policy considerations. The existence of such a privilege is a questions of law and "results from the court's determination that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Lewis*, 389 N.W.2d at 889 (emphasis added).

Here, the district court correctly determined that the record demonstrated Alvarado acted upon a proper occasion and from a proper motive. Alvarado testified that she discussed the events at the Harbor bar with her long-term partner and her parents in an effort to get emotional support and assistance in deciding whether she should report Nelson's conduct to her employer. A finding of qualified privilege is therefore supported by the record and is unquestionably good public policy.

52

Moreover, there is no evidence or even an accusation that Alvarado recounted the events that occurred at the Harbor Bar to any co-workers or to any customers at the bank. There is also no allegation that Alvarado shared her account publicly, such as by posting about it on social media. Instead, Nelson argues that Alvarado "defamed" her by talking to her immediate family members and long-term boyfriend in an attempt to get support and advice following the incident of sexual harassment. As a matter of common sense and public policy, this is not a factual scenario that supports a defamation claim.

Indeed, under Nelson's proposed interpretation of defamation law, any individual that discusses harassment with a family member or partner would be subject to a defamation suit and summary judgment could never be granted in these scenarios. Rather, those claiming harassment would be forced to trial and have the burden on demonstrating harassment occurred to defend against a civil cause of action. Nelson has cited no authority for this absurd legal conclusion that also results in the shifting of the burden of proof to the defendant.

Notably, there is also no evidence in the record that these statements caused any harm to Nelson whatsoever. Indeed, Nelson did not even learn of such statements until Alvarado's deposition. The purpose of a defamation claim is to offer redress to a person who has been harmed by reputational damages caused by published statements. The statements made by Alvarado to her immediate family

53

members and partner were made privately. Nelson has not cited a single case in which a defendant has been held liable for making supposed defamatory statements to their immediate family members in private text messages or inside private homes.

On the contrary, the Minnesota Supreme Court has previously held that "[historically], a qualified privilege has protected a publication when it was made by a person … in the conduct of his own affairs and in matters where his interest is concerned. *Moreno v. Crookston Times Printing Co.,* 610 N.W.2d 321, 328 (Minn. 2000). Alvarado's statements to her family and partner squarely fall within this this established qualified privilege. Alvarado's statement concerned her private interests and were made in the conduct of her private affairs. Indeed, Alvarado testified that she was seeking advice about what she should do and whether she make a report to the Bank.

Because Alvarado is entitled to a qualified privilege protecting the statements she made to immediate family members and her long-term partner, Nelson's defamation claim must fail.

## **CONCLUSION**

Nelson was terminated from her employment with Lake Elmo Bank after her direct report, Alvarado, made a formal complaint to Human Resources that Nelson had sexually harassed her at a local bar. Based on the undisputed record evidence, the decision to terminate Nelson's employment had nothing to do with her sex.

54

Moreover, the statements that Nelson complains are defamatory were made for a proper purpose on a proper occasion, for the purpose of reporting Nelson's harassing conduct. Thus, the statements are entitled to a qualified privilege and cannot establish the basis of a defamation claim.

The district court correctly dismissed Nelson's sex discrimination and defamation claims. Because the records supports Lake Elmo Bank's decision to terminate Nelson, and there are no fact issues for a jury to decide, the Court should affirm the district court's decision granting Lake Elmo Bank summary judgment on Nelson's sex discrimination claim. Additionally, because each of the alleged defamatory statements made by Alvarado and other bank employees is entitled to a qualified privilege and there is no record evidence of actual malice, this Court should affirm the district court's decision granting Alvarado and LEB summary judgment on Nelson's defamation claims.

Respectfully submitted,

Dated: November 21, 2022

**GORDON REES SCULLY MANSUKHANI**

*/s/ Erin S. Conlin*
Ellen A. Brinkman (#0386578)
Erin S. Conlin (#0400036)
Gordon Rees Scully
Mansukhani
100 S. Fifth Street, Suite 1900
Minneapolis, MN 55402

ebrinkman@grsm.com
econlin@grsm.com

**ATTORNEYS FOR APPELLEES**

Appellate Case: 22-2827     Page: 64     Date Filed: 11/28/2022 Entry ID: 5221603

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Appellees certifies that except as set forth herein this brief complies with the type limitation of Rule 32(a)(7)(B) and (C) and contains 12,523 words. The font is 14 point Times New Roman. The following word processing software system was used to prepare this brief: Microsoft Word Windows 16. The brief and addendum have been scanned for viruses and are free from viruses.


Date: November 21, 2022                    */s/ Erin S. Conlin*
                                           Counsel for Appellees